```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                           22 Cr. 273 (JSR)

VITALY BORKER,

                Defendant.

------------------------------x
                                         New York, N.Y.
                                         May 25, 2022
                                         10:05 a.m.
Before:

                    HON. JED S. RAKOFF,

                                         District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
MATTHEW WEINBERG
     Assistant United States Attorney

LEO SHALIT
     Attorney for Defendant
```

1         (Case called)
2         THE DEPUTY CLERK:  Will everybody please be seated,
3  and will the parties please draw a microphone close to them and
4  identify themselves for the record.
5         MR. WEINBERG:  Yes.  Good morning, your Honor.  AUSA
6  Matthew Weinberg appearing for the government.
7         THE COURT:  Good morning.
8         MR. SHALIT:  Good morning, your Honor.  Leo Shalit for
9  Vitaly Borker.
10        THE COURT:  Good morning.
11        We're here for arraignment.  Let me ask defense
12 counsel whether you have gone over the indictment with your
13 client and whether you want the indictment read again here in
14 open court or you waive the reading.
15        MR. SHALIT:  Your Honor, I need one minute to go over
16 the indictment with my client.  We went over the information
17 before.
18        THE COURT:  I'm sorry.  Say that again.
19        MR. SHALIT:  There was an information before, and I
20 went over that with my client.  But I would just like two
21 seconds to physically show him the paperwork, if that's okay.
22        THE COURT:  I think maybe, because of your mask, I'm
23 having a little trouble understanding you.  I'm hearing sound.
24 Why don't you go to the rostrum, and that way you can take off
25 your mask there.

1      MR. SHALIT:  Sure.  Your Honor, I'm requesting one
2 minute to go over the indictment with my client.  We have
3 discussed it orally.
4      THE COURT:  Let's just read it then.  There is no
5 sense leaving it to chance.  Please sit down.
6      MR. WEINBERG:  Your Honor, if I may just correct the
7 record.  I think defense counsel said that there was an
8 information filed.  I believe he was probably referring to the
9 complaint.  There has not been an information filed in this
10 case.
11      THE COURT:  I'm sorry.  Again, I'm having trouble
12 because of the --
13      MR. WEINBERG:  Do you want me to --
14      THE COURT:  Yes.
15      MR. WEINBERG:  I was just saying that defense counsel
16 made a reference to an information having been filed in this
17 case.
18      THE COURT:  It's an indictment.
19      MR. WEINBERG:  And I was clarifying that there has not
20 been an information filed.  I suspect that he's referring to
21 the complaint that was filed prior to the indictment.
22      THE COURT:  In any event, we're talking about
23 indictment 22 Cr. 273.  And it reads as follows:
24      "The Grand Jury charges:
25      "Count One, mail fraud.

1        "The Grand Jury charges:

2        "1. From at least in or about June 2020, up to and
3   including at least in or about February 2022, in the Southern
4   District of New York and elsewhere, VITALY BORKER, the
5   Defendant, willfully and knowingly, having devised and
6   intending to devise a scheme and artifice to defraud, and for
7   obtaining money and property by means of false and fraudulent
8   pretenses representations, and promises, for the purpose of
9   executing such scheme and artifice and attempting so to do, did
10  place in a post office and authorized depository for mail
11  matter, matters and things to be sent and delivered by the
12  Postal Service, and did deposit and cause to be deposited
13  matters and things to be sent and delivered by private and
14  commercial interstate carriers, and did take and receive
15  therefrom, such matters and things, and did cause to be
16  delivered by mail and such carriers, according to the
17  directions thereon, and at the places at which they were
18  directed to be delivered by the person to whom they were
19  addressed, such matters and things, to wit, BORKER defrauded
20  customers of his retail eyewear website, EyeglassesDepot.com
21  by, among other things, misrepresenting the authenticity and
22  condition of merchandise he sold and mailed to such customers."

23       So let me just pause there for a moment.

24       What that all means, Mr. Borker, is that you're
25  accused in the first count of committing a fraud through

1  misrepresentations about the authenticity and condition of your
2  merchandise.
3      And it's further alleged that in execution of that
4  fraud, you or someone involved sent either a letter through the
5  mail or sent something through FedEx or that equivalent.
6      So let's go to Count Two.
7      "Wire Fraud:
8      "The Grand Jury charges:
9      "From at least in or about June 2020, up to and
10 including at least in or about February 2022, in the Southern
11 District of New York and elsewhere, VITALY BORKER, the
12 Defendant, willfully and knowingly, having devised and
13 intending to devise a scheme and artifice to defraud, and for
14 obtaining money and property by means of false and fraudulent
15 pretenses,  representations, and promises, did transmit and
16 cause to be transmitted by means of wire, radio, and television
17 communication in interstate and foreign commerce, writings,
18 signs, signals, pictures, and sounds, for the purpose of
19 executing such scheme and artifice, to wit, BORKER defrauded
20 customers of his retail eyewear website, EyeglassesDepot.com,
21 by, among other things, making misrepresentations via email and
22 telephone concerning the authenticity and condition of
23 merchandise he offered for sale and sold to customers."
24      So let me pause there.
25      What that means, Mr. Borker, is basically they're

1   charging the same fraudulent scheme.  They claim that you
2   intentionally made these misrepresentations.  But in Count Two,
3   the scheme was executed, at least in part, through interstate
4   or foreign use of wire communications such as the telephone or
5   emails.
6           Let's go to Count Three.
7           "Aggravated Identity Theft
8           "The grand jury charges:
9           "3. From at least in or about June 2020, up to and
10  including at least in or about February 2022, in the Southern
11  district of New York and elsewhere, VITALY BORKER, the
12  Defendant, knowingly did transfer, possess, and use, without
13  lawful authority, a means of identification of another person
14  during and in relation to a felony violation enumerated in
15  Title 18, United States Code, Section 1028A(c), to wit, BORKER
16  used and transferred the names of two other persons,
17  ("Individual- 1" and "Individual-2"), during and in relation to
18  the mail and wire fraud violations charged in Counts One and
19  Two of this Indictment."
20          So, again, I'll pause.
21          Mr. Borker, what that means is that if you did engage
22  in the fraudulent scheme alleged in the earlier counts, they
23  further charge that as part of that scheme, you unlawfully used
24  the names of persons you didn't have permission to use, a form
25  of identity theft.

1        There's also a forfeiture allegation which reads as
2   follows:
3        "4. As a result of committing the offenses alleged in
4   Counts One and Two of this Indictment, VITALY BORKER, the
5   Defendant, shall forfeit to the United States, pursuant to
6   Title 18, United States Code, Section 981(a)(1)(C) and Title 28
7   United States Code, Section 2461(c), any and all property, real
8   and personal, that constitutes or is derived from proceeds
9   traceable to the commission of said offense, including but not
10  limited to a sum of money in United States currency
11  representing the amount of proceeds traceable to the commission
12  of said offenses and the following specific property:
13       Any and all funds on deposit in Bank of America
14  account 4830 7587 0329, held in the name of "EyewearDepot Inc"
15  and all funds traceable thereto, including accrued interest."
16       What that means, Mr. Borker, is that if they prove you
17  engaged in this alleged fraud, they can also take all the money
18  that you realized from the fraud.
19       And finally, there is a substitute asset provision
20  which reads as follows:
21       "5. If any of the above-described forfeitable
22  property, as a result of any act or omission of the defendant:
23       "A. cannot be located upon the exercise of due
24  diligence;
25       "B. has been transferred or sold to, or deposited

1           With, a third party;

2           "C. has been placed beyond the jurisdiction of the
3      Court;

4           "D. has been substantially diminished in value; or

5           "E. has been commingled with other property which
6   cannot be divided without difficulty; it is the intent of the
7   United States, pursuant to Title 21, United States Code,
8   Section 853(p) and Title 28, United States Code, Section
9   2461(c), to seek forfeiture of any other property of the
10  defendant up to the value of the above forfeitable property."

11           And what that means, Mr. Borker, is supposing under
12  the alleged fraud you profited $1 million but you only have
13  $500,000 left in your account, they intend to go after other
14  assets you have for the remaining $500,000.

15           For each and every one of these charges, you are
16  presumed innocent.

17           Let me ask defense counsel:

18           Would you like a plea of not guilty to be entered at
19  this time?

20           MR. SHALIT:  Yes, your Honor.

21           THE COURT:  A plea of not guilty will be entered.

22           How long does the government want for completion of
23  discovery?

24           MR. WEINBERG:  Your Honor, the government would
25  request two weeks.  And I can provide a bit more context about

1  the discovery.

2          The government does expect that it will make a
3  production of a substantial portion of the discovery much
4  sooner than two weeks, probably within the next few days.  But
5  there are certain other materials that will follow that can
6  take us closer to that two-week deadline.

7          So, first of all, there are over 45,000 emails which
8  were seized pursuant to search warrants for four email
9  accounts.  And those have been reviewed, and they're prepared.
10 We've started the process of getting them in a format to get
11 them produced to defense counsel.

12         We'll be producing them in text-searchable PDFs, and
13 it just takes some time for that process to run.  Hopefully
14 we'll get it out next week, but it may take closer to two
15 weeks.

16         And then secondly, seized from the defendant's home at
17 the time of his arrest pursuant to a search warrant, there were
18 three computers, an iPad, and five cellphones.  The government
19 intends to produce full extractions, full copies, of those
20 devices to defense hopefully this week.  But it will take a
21 little bit more time to get out what we refer to as the
22 identified dataset of what has been seized pursuant to the
23 warrant.

24         THE COURT:  That's fine.  So we'll set June 8 for the
25 completion of all discovery.

1            So how long does defense counsel want thereafter for
2  the making of any motions?
3            You can remain seated.  Just bring the microphone
4  close to you.
5            MR. SHALIT:  Your Honor, my client is presently
6  incarcerated in Westchester County Jail, and it's challenging
7  to review the discovery with him.  As part of my application, I
8  was planning to ask, in the event that he's not released on
9  bail, to provide him with access to a computer so that we can
10 review the discovery.  It's very difficult to go up there.
11           THE COURT:  That's fine.  But assuming, for the sake
12 of argument -- I understand you may have a bail application
13 shortly.  Assuming for the sake of argument he remains
14 detained, how long do you want for the making of any motions?
15           I'm prepared to issue any reasonable order you propose
16 to the Westchester facility to make sure that they give your
17 client access to discovery and so forth.
18           MR. SHALIT:  I would need a couple months, your Honor.
19           THE COURT:  No.  That seems unreasonable to me.
20           MR. SHALIT:  To review all of the discovery?
21           THE COURT:  I know you have to review all of the
22 discovery.  I normally give two weeks.  I'm prepared to extend
23 it beyond that, although the government says they're going to
24 get you some of the discovery almost immediately.  But two
25 months seems to me excessive.

1     Let's look at the calendar.  I think I will give you
2  one month.  So that will be July 8.  So any motions need to be
3  filed by July 8.  And we'll set this down for a further
4  conference.
5     Linda, what's the story on either July 11 or July 12?
6     THE DEPUTY CLERK:  On July 11, we just have an 11:00
7  and a 4:00.
8     THE COURT:  Okay.  So let's set it down for a further
9  conference for 2:00 on July 11.  At that time if motions have
10 been made that can be dealt with orally, they will be.  If they
11 require a written response, we'll set the time for that at that
12 time.  And in any event, we'll set a trial date at that
13 conference.
14    So pursuant to Section 3161 of Title 18, I will
15 exclude from calculations under the Speedy Trial Act all time
16 between now and July 11 finding that such time is necessary for
17 the completion and review of discovery, the drafting of any
18 motions, and that for those and other reasons apparent from
19 this transcript, the best interests of justice in excluding
20 such time substantially outweighs the interest of the defendant
21 and the public in a speedy trial.
22    All right.  So now there was a bail application.
23    MR. WEINBERG:  Your Honor, one other thing on
24 discovery that I meant to mention earlier is the parties have,
25 just right before the conference, signed a proposed protective

1   order.

2              THE COURT:  Do you want to hand that up.

3              MR. WEINBERG:  Yes.

4              THE COURT:  All right.  This looks fine.  I have
5   signed it, and I will give it to my courtroom deputy to docket.

6              I should mention again to defense counsel that if your
7   client remains detained and you need orders to facilitate your
8   client seeing discovery and so forth, I'm happy to give you
9   those orders.

10             What you should do is draft such an order; show it to
11  the government to make sure they have no objection; and then if
12  they do not have an objection, just send it to me; and I'll
13  sign it.  If they do have an objection, you should jointly
14  call, and I'll hear whatever the objections are.

15             MR. SHALIT:  Thank you, your Honor.

16             THE COURT:  Now, there was a bail application.

17             MR. SHALIT:  Yes, your Honor.  In anticipation of this
18  arraignment, I have reached out to the government to discuss
19  whether they would be amenable to any type of bail package.  My
20  understanding is that they are not.

21             However, the Constitution and Congress say that
22  detention pending trial is only appropriate where no condition
23  or no combination of conditions would reasonably assure his
24  appearance at trial.

25             I submit to the Court that there are a combination of

conditions in this case which would ensure that Mr. Borker not only attend trial but is also not able to engage in any potential conduct that the government is worried about. And those conditions that we are proposing are as follows:

He is proposing to sign a personal recognizance bond. There are two sureties, one being his mother and another being a former police officer, who are willing to act as sureties in this case. My client also owns real estate where there is equity that he is willing to place a bond on.

Additionally, and I think equally important in this case, your Honor, is he's willing to submit to not only electronic monitoring but also to installing an internet blocker in the residence to ensure that he has no access to the internet through the phone, computer, or otherwise which would make it impossible to engage in the type of conduct which the indictment contemplates.

He has completed a program in the facility, and he has good recommendations from this program, your Honor. I have a letter from the program.

THE COURT: Let me just make sure I understand.

First of all, how much of a bond are you proposing? What's the amount?

MR. SHALIT: The amount would be almost any amount of money that is sufficient to the government -- I've spoken with my client about it -- what is reasonable.

1              THE COURT:  All right.  Secondly, are we talking about
2     home confinement?
3              MR. SHALIT:  If your Honor believes that home
4     confinement is appropriate, my client is willing to do that.
5     His mother is elderly.  He really wishes to be with her at this
6     portion in her life, and we're trying to explore all the
7     opportunities to --
8              THE COURT:  How old is his mother?
9              MR. SHALIT:  Eighty-two.
10             THE COURT:  Where does he live, and where does she
11    live?
12             MR. SHALIT:  She lives in an apartment in Brooklyn,
13    and he also -- his house is in Brooklyn approximately
14    five/ten minutes.  But they live in Sheepshead Bay.  It's all
15    the same neighborhood.
16             THE COURT:  She lives in a house?
17             MR. SHALIT:  She lives in an apartment; he lives in a
18    house.
19             THE COURT:  I'm sorry.  Okay.  And about ten minutes
20    away from each other?
21             MR. SHALIT:  Right.
22             THE COURT:  Go ahead.
23             MR. SHALIT:  I don't think he has anybody else or she
24    has anyone else.  There are grandchildren.  But really, you
25    know, if the government is concerned about the alleged conduct

1    continuing, the internet blocker and any other conditions that
2    they feel are appropriate we are willing to agree to simply to
3    give us an opportunity to prepare this case for trial.
4               THE COURT:  Okay.  Let me ask the government.
5               You're opposing.  And why is that?
6               MR. WEINBERG:  Yes, your Honor.  First of all, the
7    government did understand that defense intended to make a bail
8    application.  But right before the conference was the first
9    that the government understood the specific proposal, which is
10   totally fine of course.
11              But for something like the internet blocker, that is
12   the first that the government heard of that.  And the
13   government has not had a chance to speak to pretrial services
14   regarding whether that is something that is even feasible or
15   could be monitored and enforced.
16              So just putting that to one side, the reason the
17   government had originally sought detention in this case back in
18   magistrate court, in February at the time of arrest, we sought
19   a detention hearing due to the serious risk that the defendant
20   would flee or attempt to obstruct justice and then in turn
21   sought detention for those reasons and also dangerousness to
22   the community.
23              And as we explained in magistrate court -- and much of
24   what I say will be a rehashing of that argument.  This is the
25   defendant's third arrest for virtually engaging in the same

1  conduct.  The last two arrests, the second and third arrest,
2  this one and the last one, both occurred while the defendant
3  was on supervised release for his prior arrest.  And actually
4  the second arrest occurred for conduct that began while he was
5  on pretrial release relating to his first arrest.
6          So kind of going back through the history here, in
7  December 2010, the defendant was arrested in connection with an
8  operation called decormyeyes.com.  That website is
9  substantially similar, nearly identical, frankly, to the
10 website at issue in this case.
11         He pled guilty in May 2011 to wire fraud and mail
12 fraud, as well as to making interstate threats based on
13 threatening messages that were sent to customers of that
14 website, and he was sentenced to four years in prison.
15         He was released from prison in 2015 and was then
16 arrested in May 2017 for his operation of a website
17 opticsfast.com, again a nearly identical website to the website
18 at issue in this case.
19         He was alleged to have started the operation of
20 opticsfast.com while on pretrial release for his arrest
21 relating to decormyeyes.com.  He ultimately received around a
22 four-year sentence in total for that conduct.  I believe it
23 broke down as a two-year sentence for the new charges before
24 Judge Gardephe and two years on the VOSR on the original case
25 which was before Judge Sullivan.

1          The defendant then enters a residential reentry center
2   in June 2020 at the end of his term for those charges, for the
3   new charges and the violation.  And the allegations in this
4   case are that the fraud began in June 2020 while the defendant
5   was assigned to the residential reentry center and leaving the
6   center at times to go back to his home.
7          I should also add here that the defendant is on
8   supervised release or was on supervised release at the time of
9   this arrest.  Judge Gardephe -- there has been no action yet on
10  that case.  But I think it stands to reason that there will be
11  violation proceedings before Judge Gardephe in that case.
12         And so the government's view is that this record
13  speaks to the defendant's utter inability to comply with lawful
14  orders and his unfitness for pretrial release.  There is case
15  law -- I do not have it before me, but there is case law for
16  the proposition that for the defendants who violate pretrial
17  release and probation are poor candidates for bail in future
18  proceedings.
19         And of course there is the issue of the continued
20  financial dangerousness to the community, as well as the prior
21  conduct of making threatening statements and harassing
22  customers of the website.
23         So for those reasons, your Honor, the government
24  believes that the defendant is a poor candidate for bail
25         MR. SHALIT:  Your Honor, there is a presumption of

innocence that applies to these proceedings, irrespective of whatever happened in the other cases. I believe my client was granted bail and did appear in those proceedings.

THE COURT: As I understand the government's argument, it's not so much about flight as it is about danger to the community. What they're saying is that he has repeatedly engaged in the same kind of conduct using the same kind of approach and had been so unrepentant that as soon as he gets out of prison, he starts it again, even when he's on supervised release, and that there's every reason then to believe that if he's out at large now, he'll just do what he's done repeatedly before, which is go back to committing fraud on the internet.

And sure there are steps that can be taken in terms of blocking access and things like that that would be helpful. But from substantial experience -- I'm already aware from other cases that none of that is foolproof.

And it would be even less foolproof if he not only were operating out of his own apartment but also going to visit his mother. So that's the problem that you face. It's not so much the issue of flight.

MR. SHALIT: Sure. I'm prepared to address that, your Honor.

THE COURT: Please.

MR. SHALIT: That's why we are proposing the internet blocker and computer monitoring, in addition to home detention

1  if the government is able to track what he's doing on the
2  internet -- and my client has represented to me that he doesn't
3  even want to be on the internet.
4           THE COURT:  The problem is that none of that stuff is
5  foolproof, and I've seen that in other cases.  And, frankly, I
6  think we all know it from everyday experience.
7           So here's what I think makes sense.  I will deny the
8  application for now.  But if the defense can satisfy the
9  government or the probation office that there is a way to
10 arrange a release that would make it impossible for him to have
11 any contact with the internet of any kind -- I'm not talking
12 about monitoring.  I'm talking about no use of the internet.
13 Most of us lived most of our lives before there was an
14 internet, and somehow we managed to get along -- that would be
15 something I would then consider.  All right.
16          Anything else we need to take up today?
17          MR. WEINBERG:  Nothing from the government, your
18 Honor.
19          MR. SHALIT:  I will submit a proposed order regarding
20 computer access in the facility.
21          THE COURT:  Yes.  That's fine.  As I say, anything
22 reasonable you submit in that regard, I'll be happy to sign.
23          MR. SHALIT:  My client just advised me during the
24 proceeding that they only allow him one hour a day to --
25          THE COURT:  So why don't you put into your order

something more extensive.  If they give you trouble at the facility notwithstanding my order, my experience is that in those situations, if I call the warden personally, we can work it out and my order gets followed.  Of course if my order doesn't get followed, then I could always, in theory, hold the warden in contempt of court.  But I've never actually had to do that.

         MR. SHALIT:  I understand.  Thank you, your Honor.

         THE COURT:  Very good.  Thanks very much.

         MR. SHALIT:  Thank you.

         (Adjourned)