**TO: Clerk's Office**
## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK



_____

**APPLICATION FOR LEAVE
TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____

Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ____
Name:_____
Firm Name:_____
Address:_____
_____
Phone Number:_____
E-Mail Address:_____

UNDERLINE UPON THE PUBLIC DOCKET SHEET: YES_____ NO_____
**If yes, state description of document to be entered on docket sheet:**

_____

_____

**_____**

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** ____This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

_____          _____
DATE                                    SIGNATURE

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

_____

_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED:                                    , NEW YORK

_____

**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE_____
                                                    DATE

USAO_0000312

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 56 BEAUMONT STREET, BROOKLYN, NEW YORK 11235 | **TO BE FILED UNDER SEAL**<br><br>**APPLICATION FOR A SEARCH WARRANT**<br><br>Case No. 22-MJ-186 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, DANIEL J. GABEL, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am, and have been for more than four years, a Postal Inspector with the United States Postal Inspection Service ("USPIS").  As a federal agent, I am authorized to investigate violations of laws of the United States, execute warrants issued under the authority of the United States and make arrests for criminal offenses committed within the United States.  I have received training and been involved in the investigation of cases involving fraud.

2.     As a Postal Inspector, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. During my time as a Postal Inspector, I have participated in investigations into and received training regarding wire fraud, bank fraud, and aggravated identity theft. I have participated in the execution of search warrants of premises, including those involving electronic evidence. Through my training and experience, I have become familiar with the manner in which

people use technology to commit crimes and the law enforcement techniques that can be used to investigate and disrupt such activity.

3.      I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, from my review of the investigative file and from reports of other law enforcement officers involved in the investigation. Unless specifically indicated, all conversations and statements described in this affidavit are relayed in sum and substance and in part only. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      This affidavit is submitted in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 authorizing the search of:

a.      The premises known and described as 56 Beaumont Street, Brooklyn, New York 11235, and any closed containers/items contained therein (the "SUBJECT PREMISES"). The SUBJECT PREMISES is further described below and in Attachment A.

5.      As set forth below, there is probable cause to believe that a search of the SUBJECT PREMISES will yield evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1341 and 2 (mail fraud), 1343 and 2 (wire fraud), and 1028A(a)(1), 1028A(b) and 2 (aggravated identity theft) (the "Subject Offenses"), as more fully described in Attachment B.

## The SUBJECT PREMISES

6.      The SUBJECT PREMISES are particularly described as 56 Beaumont Street, Brooklyn, NY, 11235, and are a two-story brick dwelling with an attached garage, located

2

on the west side of Beaumont Street between Shore Boulevard and Hampton Avenue. A

photograph of the SUBJECT PREMISES is included below.



**PROBABLE CAUSE**

**Probable Cause Regarding Commission of the Subject Offenses**

7.      On February 16, 2022, Magistrate Judge James L. Cott of the Southern

District of New York signed a criminal complaint and accompanying arrest warrant charging

VITALY BORKER ("BORKER") with violations of Title 18, United States Code, Sections 1341

(mail fraud), 1343 (wire fraud), and 1028A(a)(1), 1028A(b) and 2 (aggravated identity theft). A

3

copy of the complaint (the "Complaint") is attached hereto as Exhibit 1 and is incorporated by reference as if fully set forth herein.

8.     As further detailed in the Complaint, BORKER operates a website called EyeglassesDepot.com, which is engaged in the business of eyewear sales and repair services. As set forth in the Complaint, EyeglassesDepot.com makes numerous false claims to its customers regarding the condition and authenticity of eyewear sold on the website and its repair and prescription services.

9.     In addition, as further detailed in the Complaint, in order to conceal his control of EyeglassesDepot.com, BORKER – who has twice previously been convicted in the Southern District of New York in connection with his operation of online eyewear businesses – has assumed the identities of two individuals, specifically his mother, Yevgenya Borker, and an individual named Alexander ("Alex") Volk, to conduct business on behalf of EyeglassesDepot.com

**Probable Cause Justifying Search of the SUBJECT PREMISES**

10.     For the reasons set forth below, I respectfully submit that probable cause exists to believe that the SUBJECT PREMISES will contain evidence, fruits, and/or instrumentalities of the Subject Offenses.

11.     Based on my communications with a United States Probation Officer (the "Probation Officer") assigned to supervise BORKER during his ongoing term of supervised release following his release from federal prison in 2020, I know that BORKER resides at the SUBJECT PREMISES.  Specifically, the SUBJECT PREMISES is the address on file with the

4

United States Probation Office for BORKER, and the Probation Officer has visited BORKER at the SUBJECT PREMISES.  I have also showed the Probation Officer the picture of the SUBJECT PREMISES included in paragraph 6 *supra* and Attachment A, and the Probation Officer confirmed that it was a photograph of BORKER's residence.

12.     Furthermore, based on my communications with United States Postal Inspectors who were present for BORKER's prior arrests in 2010 and 2017, I know that BORKER was arrested at the SUBJECT PREMISES and that the SUBJECT PREMISES were searched pursuant to search warrants obtained in those cases.

13.     In addition, based on my personal participation in this investigation, I know that particular internet protocol ("IP") addresses affiliated with the SUBJECT PREMISES have regularly accessed online accounts which are used to conduct business on behalf of EyeglassesDepot.com.  Specifically:

a.     Based on my review of records from an internet provider, I know that there are at least two IP addresses (the "IP Addresses") associated with the SUBJECT PREMISES.

b.     Based on my review of records from an online marketplace of goods ("Online Marketplace-1"), I know that one of the IP Addresses is regularly accessed in order to purchase eyewear on Online Marketplace-1 in order to fill orders placed by customers of EyeglassesDepot.com.

c.     Based on my review of records from a provider of email services, I know that one of the IP Addresses is regularly accessed in order to log in to three email

5

addresses that are used in connection with the operation of the EyeglassesDepot.com business.  I also know that one of these email addresses is also affiliated with an Internet-serviced phone number that is regularly used to communicate with customers of EyeglassesDepot.com.

                    d.      Based on my review of records from an online payment processing company ("Payment Processor-1") that processes payments on behalf of EyeglassesDepot.com, I know that one of the IP Addresses is regularly accessed in order to log in to an account at Payment Processor-1 held in the name of a particular corporation, "Eyeweardepot Inc" ("Corporation-1").[1]  In addition, I know that, in connection with maintaining its account at Payment Processor-1, Corporation-1 submitted proof of its inventory and business to Payment Processor-1.  The proof submitted by Corporation-1 included, among other things, the below photograph.  I have compared the below photograph and other photographs submitted by Corporation-1 to Payment Processor-1 with photographs of the SUBJECT PREMISES taken in connection with a search warrant executed at the time of a previous arrest of BORKER.  I have also shown the photographs to Postal Inspectors who were present at the time of BORKER's previous arrests at the SUBJECT PREMISES.  Based on my personal comparison of the photographs and my discussions with other Postal Inspectors, I know that the photographs of

---

[1] As set forth in the Complaint, I know based on my conversations with the Probation Officer that BORKER claims that Eyeweardepot Inc., or Corporation-1, is the owner of EyeglassesDepot.com.  The account held by Corporation-1 at Payment Processor-1 is used to process payments made by customers of EyeglassesDepot.com in connection with the order of eyewear from EyeglassesDepot.com.

USAO_0000318

eyewear inventory submitted by Corporation-1 to Payment Processor-1 were taken from inside of the SUBJECT PREMISES.



e.        Based on my review of records from a bank ("Bank-1") where Corporation-1 held an account, I know that one of the IP Addresses is regularly accessed in order to log in to the online account held by Corporation-1 in order to receive funds and otherwise conduct business on behalf of EyeglassesDepot.com.

14.        Therefore, I submit that there is probable cause that BORKER has committed the Subject Offenses and that fruits, instrumentalities, and evidence of the Subject Offenses will be found within the SUBJECT PREMISES.

### Probable Cause Justifying Search of ESI

15.        Based on the facts set forth above, my training and experience, and my participation in this investigation, I believe that the Subject Offenses are being perpetrated through the use of computers and cellphones to access email accounts, online marketplaces, payment processing companies, banks, and other third-party service providers to EyeglassesDepot.com in order to conduct business on behalf of EyeglassesDepot.com.  I also know that individuals engaged in perpetrating frauds such as the fraud at issue here often store

7

data on their computers and cellphones related to their illegal activity, which can include logs of online "chats" with third parties and potential co-conspirators; email correspondence and/or chats; contact information of third parties and potential co-conspirators and their aliases or shell companies, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; and/or records of illegal transactions or the disposition of criminal proceeds.

16.     Based on my training, experience, and involvement in this investigation, including my review of materials obtained pursuant to grand jury subpoenas, I believe there is probable cause to believe that computers, media storage devices, and other electronic devices and equipment are maintained at the SUBJECT PREMISES and will contain evidence, fruits, and/or instrumentalities of the Subject Offenses for the following additional reasons:

a.     I know that individuals who participate in mail fraud, wire fraud, and aggravated identity theft frequently do so using electronic devices, including computers or cellular devices. As noted above, BORKER has used computers and/or cellular devices to access the IP Addresses at the SUBJECT PREMISES in furtherance of the frauds.

b.     I have learned that participants in mail fraud, wire fraud, and aggravated identity theft schemes often use multiple electronic devices and cellphones to further their schemes in a number of ways, including as a means to store information relating to their schemes, and to communicate with co-conspirators and victims, and third-party vendors such as banks and other service providers. Such persons also commonly maintain contact information on their cellphones, including names, telephone numbers, and direct connect numbers for their criminal associates or

8

victims in the memory of their cellphones, which would assist in the identification of potential co-conspirators.

        c.      Based on my training and experience, I know that individuals who engage in mail fraud, wire fraud, and aggravated identity theft, similar to individuals who engage in other types of criminal conduct, will often back up or transfer files from old computers' hard drives or when transitioning to new computers, so as not to lose data, which would be valuable in facilitating their criminal activity. In addition, individuals who engage in such criminal activity will often also store or transfer files on electronic storage media other than computer hard drives, including thumb drives, flash memory cards, CD-ROMs, or portable hard drives to, for example, facilitate the use of the information or to transfer it to others. I know that individuals who engage in such criminal activity also often maintain physical evidence of their criminal activity, including printouts of documents and records that are also stored electronically, as described above, or handwritten or typed notes, diagrams, or lists of the same, for example as a backup in case of a failure of the electronic media on which they were stored or to facilitate use of the data.

        17.      Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet

9

are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

18.     In addition to there being probable cause to believe that computer devices will be found at the SUBJECT PREMISES that contain evidence of the Subject Offenses, there is also probable cause to believe that these computers constitute instrumentalities of the Subject Offenses.

19.     Based on the foregoing, I respectfully submit there is probable cause to believe that BORKER has engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the SUBJECT PREMISES and on computers and electronic media found in the SUBJECT PREMISES.

## TECHNICAL INFORMATION

20.     This application seeks permission to search for, among other things, electronic devices and electronic records that might be found in any of the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is as data stored on an electronic device's hard drive, a smartphone, or other electronic storage media. As described above, BORKER is known to use computers and/or smartphones in the course of conducting the Subject Offenses. Thus, the warrant applied for would authorize the

10

seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

        21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

        a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

        b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage

USAO_0000323

medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least

12

four satellites, a computer connected to that antenna can mathematically calculate the antenna's

latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic

device used for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs. Some PDAs also function as wireless communication devices and are used

to access the Internet and send and receive e-mail. PDAs usually include a memory card or other

removable storage media for storing data and a keyboard and/or touch screen for entering data.

Removable storage media include various types of flash memory cards or miniature hard drives.

This removable storage media can store any digital data. Most PDAs run computer software,

giving them many of the same capabilities as personal computers. For example, PDA users can

work with word-processing documents, spreadsheets, and presentations. PDAs may also include

global positioning system ("GPS") technology for determining the location of the device.

f.     Tablet: A tablet is a mobile computer, typically larger than a phone

yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function

as wireless communication devices and can be used to access the Internet through cellular

networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps,

which, like programs on a personal computer, perform different functions and save data

associated with those functions. Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g.     Pager: A pager is a handheld wireless electronic device used to

contact an individual through an alert, or a numeric or text message sent over a

13

telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j.     Based on my training, experience, and research, I know that cellular telephones such iPhones have the capability to serve as a wireless telephone, digital camera, GPS navigation device and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

14

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.     *Forensic evidence.* As further described below, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic devices described herein was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on such devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

15

USAO_0000327

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device in furtherance of operating a fraudulent business, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

24.      *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

16

with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25.     *Biometric Unlocking*. In my training and experience, it is likely that if a subject has any electronic devices on his person or in his belongings, then one or more of those devices uses biometric unlocking features, such as facial recognition unlocking. The warrant I am applying for would permit law enforcement to compel the subject to unlock any electronic devices using the devices' biometric features. I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The

17

fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

        c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain cellular phone devices. In order to activate this unlocking mechanism, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

        d.      If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared sensitive camera detects the registered irises. Iris recognition features on other manufacturers' devices have different names but operate similarly to Windows Hello.

        e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are

18

USAO_0000330

engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

     f.  I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked, or (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Biometric features from other electronic device brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

     g.  The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the search authorized by the requested warrant, it will likely be necessary to press the finger(s) of the user on the fingerprint reader of any device capable of biometric unlocking. The government may not otherwise be able to access the data contained on the electronic devices for the purpose of executing the search authorized by this warrant.

     h.  In my training and experience, the person who is in possession of a

19

USAO_0000331

device or has the device among his or her belongings at the time the device is found is likely a user of the device.

26.     Due to the foregoing, if any of BORKER's electronic devices may be unlocked using one of the aforementioned biometric features, then the warrant I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of BORKER against the fingerprint scanner of the device; (2) hold BORKER in place while holding the device in front of BORKER's face to activate the facial recognition feature; and/or (3) hold BORKER in place while holding the device in front of BORKER's face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## **CONCLUSION**

27.     Based upon the foregoing, there is probable cause to believe that a search of the location described in Attachment A, to search for and/or seize the items set forth in Attachment B will uncover evidence, fruits and/or instrumentalities of the Subject Offenses.

28.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this Affidavit and the search warrants. As described above, the investigation is ongoing and not known to its targets or subjects. Further, this affidavit (and its attachments) describe confidential sources whose identity could be ascertained from this affidavit. Accordingly, I believe that public and/or premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely

20

jeopardize its effectiveness, and may result in destruction of or tampering with evidence and/or

intimidation of potential witnesses.

Respectfully submitted,

Daniel Gabel

Daniel J. Gabel
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me by telephone
on February __, 2022

HON. SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

21

USAO_0000333

## **ATTACHMENT A**

*Premises to be searched*

The SUBJECT PREMISES are particularly described as 56 Beaumont Street, Brooklyn, NY, 11235, and are a two-story brick dwelling with an attached garage, located on the west side of Beaumont Street between Shore Boulevard and Hampton Avenue.  A photograph of the SUBJECT PREMISES is included below.



**ATTACHMENT B**

*Items to be seized*

The items to be seized from the SUBJECT PREMISES consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 and 2 (mail fraud), 1343 and 2 (wire fraud), and 1028A(a)(1), 1028A(b) and 2 (aggravated identity theft) (together, the "Subject Offenses") described as follows:

1.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, identification documents, address books, AND telephone directories.

2.      Evidence concerning the ownership and/or use of the electronic devices found in the Subject Premises, including sales receipts, bills for internet access, and notes in computer manuals.

3.      Identification documents, correspondence, applications, loan documents, mail, account statements, bills, credit cards, financial records, and other documents in the name of, or addressed to, or referencing any person that is not a resident of the SUBJECT PREMISES, including Yevgenya Borker and Alex Volk, which may be evidence of the use of aliases in the commission of the Subject Offenses.

4.      Evidence concerning the operation of EyeglassesDepot.com, OpticsFast.com, DecorMyEyes.com, or other eyewear businesses.

5.      Evidence concerning the statements, representations and advertisements on the EyeglassesDepot.com website, and the falsity of such statements.

6.      Data relating to the EyeglassesDepot.com website, including, but not limited to, data reflecting product postings, website modifications, transactional records, fillable forms, private messages with customers, administrator logins, and other user activity on the website.

7.      Evidence concerning the link between EyeglassesDepot.com, DecorMyEyes.com, and OpticsFast.com.

8.      Documents referencing the names and employment of employees of EyeglassesDepot.com.

9.      Evidence concerning any eyeglasses inventory or merchandise, including but not limited to eyewear and contact lenses.

10.     Documents relating to customers or prospective customers of EyeglassesDepot.com, including lists of customers, communications with customers, records of complaints and/or disputes by or about customers or prospective customers.

11.     Documents relating to vendors, suppliers, or sellers of goods to EyeglassesDepot.com, including lists of vendors or sellers, communications with vendors or sellers, and records of complaints and/or disputes by or about vendors or sellers.

12.     Financial records, including books, ledgers, credit card bills, and financial instruments related to EyeglassesDepot.com, OpticsFast.com, DecorMyEyes.com, or other eyewear businesses.

13.     Luxury or designer eyewear that appears to be counterfeit.

14.     Computer devices, storage media, and related electronic equipment used to access, transmit, or store information relating to the Subject Offenses.

15.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from computer devices, storage media, and related electronic equipment.

16.     Documents reflecting email accounts and/or websites associated with Vitaly Borker.

17.     Any safes, key-lock strong boxes, and other types of locked or closed containers that may contain any of the items described immediately above, which will be opened and searched at the Subject Premises if feasible.


If it is determined that one or more of electronic devices covered by this warrant can be enabled or unlocked with "Touch ID" or other biometric unlocking features, law enforcement officers are authorized to press the fingers (including thumbs) of VITALY BORKER ("BORKER") to the Touch ID sensor of the electronic device, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants. If it is determined that one or more of the electronic devices can be enabled with facial recognition, law enforcement officers will be authorized to hold the device to the face of BORKER and hold BORKER's face for the purpose of attempting to unlock the device via recognition in order to search the contents as authorized by this warrant.

2

USAO_0000336

# **EXHIBIT 1**

Approved: _____
         MATTHEW WEINBERG
         Assistant United States Attorney

Before:   HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

# **22 MAG 1638**

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :
        - v. -                    :
                                  :
VITALY BORKER,                    :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violation of
18 U.S.C. §§ 1341
1343, 1028A, and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

     Daniel J. Gabel, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and charges as follows:

### **COUNT ONE**
#### (Mail Fraud)

     1.   From at least in or about June 2020, up to and including the present, in the Southern District of New York and elsewhere, VITALY BORKER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and did cause to be delivered by mail and such carriers, according to the directions thereon, and at the places at which they were directed to be delivered by the person to whom they were

1

USAO_0000337

addressed, such matters and things, to wit, BORKER defrauded customers of his retail eyewear website, EyeglassesDepot.com, by, among other things, misrepresenting the authenticity and condition of merchandise he sold and mailed to such customers.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT TWO
(Wire Fraud)

2.   From at least in or about June 2020, up to and including the present, in the Southern District of New York and elsewhere, VITALY BORKER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, BORKER defrauded customers of his retail eyewear website, EyeglassesDepot.com, by, among other things, making misrepresentations via email and telephone concerning the authenticity and condition of merchandise he offered for sale and sold to customers.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
(Aggravated Identity Theft)

3.   From at least in or about June 2020, up to and including the present, in the Southern District of New York and elsewhere, VITALY BORKER, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, BORKER used and transferred the names of two other persons ("Individual-1" and "Individual-2") during and in relation to mail and wire fraud violations charged in Counts One and Two of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

2

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4.   I am a Postal Inspector with the USPIS. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with customers of EyeglassesDepot.com, other law enforcement agents, and my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all the facts that I have learned during the course of the investigation.  Where the contents of conversations of others are reported herein, they are reported in substance and in part.

<u>OVERVIEW OF SCHEME INVOLVING EYEGLASSESDEPOT.COM</u>

5.   EyeglassesDepot.com is a website engaged in the business of eyewear sales and repair services. The EyeglassesDepot.com homepage claims, among other things, that the website is the "planet's biggest online website for designer discount sunglasses and eyeglasses," "the top rated leader in the repair of sunglasses and eyeglasses," and "can fit any eyeglasses or sunglasses with your custom prescriptions."

6.   More specifically, EyeglassesDepot.com claims, among other things, that it sells "brand new and 100% authentic designer eyeglasses and sunglasses," that it "pride[s] [itself] in carrying current styles as well as old discontinued styles," and that it has "thousands of pairs of glasses in stock," "order[s] merchandise from the manufacturer," and "carr[ies] and stock[s] thousands of glasses ready for shipping as early as TODAY."

7.   As described in further detail below, these statements are false.  In truth and fact, the eyewear sold to customers of EyeglassesDepot.com is often used and/or counterfeit. EyeglassesDepot.com does not carry a large inventory of "brand new and 100% authentic" eyewear; instead, after an order for eyewear is placed on EyeglassesDepot.com, the website seeks to fill the order by purchasing a comparable item on a particular online marketplace of goods ("Online Marketplace-1") or through some other source.  In many cases, the eyewear purchased on Online Marketplace-1 is used and/or counterfeit, but passed off to the customer of EyeglassesDepot.com as new and authentic.

3

8.   In addition, customers who sent eyewear to EyeglassesDepot.com for repair and/or prescription services often did not have their eyewear repaired at all or otherwise received unsatisfactory work.

9.   VITALY BORKER, the defendant, operates and manages EyeglassesDepot.com.  BORKER has twice previously been convicted in this District of crimes relating to his operation of websites engaged in the business of eyewear sales and repair services, specifically, DecorMyEyes.com and OpticsFast.com.

10.   In order to conceal his role in operating EyeglassesDepot.com, VITALY BORKER, the defendant, has assumed the identities of Individual-1 and Individual-2.  In particular, BORKER claims that Individual-1 is the owner of a particular corporation ("Corporation-1") which, in turn, BORKER claims owns EyeglassesDepot.com.  And BORKER purchases eyewear on Online Marketplace-1 by using an account held in the name of Individual-2 (the "Individual-2 Account").

## EYEGLASSESDEPOT.COM DEFRAUDS CUSTOMERS

11.   Based on my review of the website EyeglassesDepot.com, I know that it contains the following statements:

a.   It sells "brand new and 100% authentic" designer eyeglasses and sunglasses.

b.   "All merchandise comes with the designer eyewear case, authenticity card and dust cloth where appropriate."

c.   It "carries over one hundred fifty different luxury discount designer brands of sunglasses" and "eyeglasses," and it "pride[s] [itself] in carrying current styles as well as old discontinued styles."

d.   It has "thousands of pairs of glasses in stock," "order[s] merchandise from the manufacturer," and "carr[ies] and stock[s] thousands of glasses ready for shipping as early as TODAY."

12.   Based on my review of the email account ("Email Account-1") to which orders placed on EyeglassesDepot.com are sent, and my review of records from Online Marketplace-1, I know that these statements are fraudulent.  Specifically, I know that, after an order is placed on EyeglassesDepot.com, the

4

USAO_0000340

website will often seek to fill the order by purchasing eyewear on Online Marketplace-1.  The account used by EyeglassesDepot.com to purchase eyewear on Online Marketplace-1 is the Individual-2 Account – that is, the account held in the name of Individual-2 – but, as set forth below, is operated and controlled by VITALY BORKER, the defendant.

13.  Based on my and another Postal Inspector's conversations with customers of EyeglassesDepot.com and my review of complaints posted online by customers of the website, I know that customers who ordered eyeglasses on EyeglassesDepot.com often received eyeglasses that were used and/or counterfeit.  In addition, I know that customers who sent eyewear to EyeglassesDepot.com for repair and/or prescription services often did not have their eyewear repaired at all and/or otherwise received unsatisfactory work.  Furthermore, after a customer requests a price quote for repair or other services by EyeglassesDepot.com, but before the customer has in fact agreed to utilize EyeglassesDepot.com's services, the website will order a pre-paid shipping label for the prospective customer to ship the eyewear to EyeglassesDepot.com.  If the customer ultimately decides not to use the website's services, EyeglassesDepot.com will attempt to charge the prospective customer a $9.99 "repair cancellation fee."  On several occasions, after a customer refused to pay the $9.99, EyeglassesDepot.com sent numerous emails and text messages harassing the prospective customer for payment and threatening to send the customer's information to a debt collector.

*Victim-1*

14.  In the course of this investigation, I have reviewed tens of thousands of emails and text messages obtained pursuant to a search warrant for certain email accounts and Internet-serviced phone numbers that were used by EyeglassesDepot.com and VITALY BORKER, the defendant (collectively, the Search Warrant Returns).[1]  Based on my review of the Search Warrant Returns and records from Online Marketplace-1, as well as my communications with a customer of EyeglassesDepot.com ("Victim-1"), I know the following:

---

[1] The Search Warrant Returns contained data from four user accounts held with a provider of internet services.  Each of these user accounts were assigned an email address, and at least two of them were also assigned Internet-serviced phone numbers.

USAO_0000341

a.   Victim-1 is a resident of Manhattan who was physically present in the district during all relevant events described herein.

b.   On or about May 5, 2021, Victim-1 exchanged text messages with a phone number that was used by EyeglassesDepot.com to communicate with customers (the "Phone Number").[2]  Specifically, Victim-1 exchanged text messages regarding eyeglasses that Victim-1 was interested in purchasing from EyeglassesDepot.com.  After further text message and telephone communications, Victim-1 ordered eyeglasses from EyeglassesDepot.com on or about May 11, 2021.  Victim-1's credit card was charged $521.91 for the purchase.

c.   On or about May 11, 2021, that is, the date that Victim-1 placed an order on EyeglassesDepot.com, an order was made by the Individual-2 Account to purchase eyewear that was similar in description to the eyeglasses ordered by Victim-1.  The order on Online Marketplace-1 was placed from an internet protocol ("IP") address (the "Borker IP") associated with VITALY BORKER's, the defendant's, residence in Brooklyn.[3]  The product description posted on Online Marketplace-1 for these eyeglasses indicated that the eyeglasses were being purchased from a seller based in Chico, California.  The Individual-2 Account paid $134.00 for the eyeglasses.

d.   On or about May 25, 2021, Victim-1 called EyeglassesDepot.com numerous times without making contact.  Victim-1 then sent a text message asking for an update on the status of Victim-1's order.  EyeglassesDepot.com responded by text, informing Victim-1 that the estimated delivery dates were

---

[2] Unless otherwise stated, all text messages and/or telephonic communications with EyeglassesDepot.com described herein were exchanged with the Phone Number.  The Phone Number is an Internet-serviced phone number, and text message and call information for the Phone Number was received as part of the Search Warrant Returns.

[3] I know BORKER's residential address because it is the physical location where he was arrested by United States Postal Inspectors in 2010 and 2017.  In addition, it is the address that BORKER has on file with the United States Probation Office in connection with his ongoing term of supervised release.  I know the IP address is associated with BORKER's residence based on my review of records from a provider of internet services.

USAO_0000342

May 15 to May 19, 2021, and that the eyeglasses were "coming from Italy as they are discontin[u]ed in USA."

e.   Victim-1 noted that the estimated delivery dates – that is, May 15 to May 19 – had already passed and asked how much longer it would be before receiving the eyeglasses. EyeglassesDepot.com responded that it was seeking additional information from the vendor.  EyeglassesDepot.com then notified Victim-1 that the item appeared to be in Chico, California and that "this is weird" because it "arrived from Italy and was to be shipped from them to me."

f.   The above statement was untrue, as the records from Online Marketplace-1 indicated at the time of purchase that the eyeglasses were being purchased from a seller located in California.

g.   On or about May 25, 2021, that is, the day after Victim-1 contacted EyeglassesDepot.com to inquire about the order, the Individual-2 Account cancelled the order for eyeglasses that had been placed through Online Marketplace-1 on or about May 11, 2021.  That same day, on or about May 25, 2021, the Individual-2 Account placed another order on Online Marketplace-1 for eyewear that was similar in description to the eyeglasses ordered by Victim-1 on EyeglassesDepot.com.  The order was placed from the Borker IP.  The product description for the eyeglasses on Online Marketplace-1 indicated that they were being purchased from a seller based in Texas.  The description also said that the eyeglasses were used.  The Individual-2 Account paid $129.99 for the eyeglasses.

h.   On or about May 27, 2021, Victim-1 sent a text message to EyeglassesDepot.com seeking information about when the eyeglasses would arrive.  EyeglassesDepot.com replied that it had reordered the item because the first order "was not clearly happening," and that the glasses would be received in "a few days."

i.   Between on or about June 1, 2021 and on or about June 4, 2021, Victim-1 attempted to reach EyeglassesDepot.com by phone on numerous occasions.  Eventually, on or about June 4, 2021, Victim-1 sent a text message to EyeglassesDepot.com asking for the status of Victim-1's order.  Victim-1 did not receive a response.  On or about June 5, 2021 and June 9, 2021, Victim-1 again attempted to reach EyeglassesDepot.com by phone.  On or about June 9, 2021, Victim-1 again sent a text message to EyeglassesDepot.com asking for an update on Victim-1's order.

7

USAO_0000343

EyeglassesDepot.com responded that it was waiting for the lenses, which were custom-ordered, and that once the lenses were received it would ship the product to Victim-1.  Victim-1 responded to ask how much longer it would be, noting that the original quote for delivery had been seven to ten business days.

   j. On or about June 16, 2021, Victim-1 requested a refund.  Later that day, EyeglassesDepot.com responded "Its been shipped FINNALLY" [sic].

   k. At some point after June 16, 2021, the eyeglasses were delivered to Victim-1's home.  Upon receiving the eyeglasses, Victim-1 observed that they did not appear to be authentic eyewear from the purported designer.

   l. After receiving the eyeglasses, Victim-1 attempted to contact EyeglassesDepot.com by phone in order to request a refund.  Victim-1 did not receive a response from EyeglassesDepot.com.  Nor did Victim-1 receive a refund.

<em>Victim-2</em>

  15. Based on my review of the Search Warrant Returns and records from Online Marketplace-1, as well as my communications with a customer of EyeglassesDepot.com ("Victim-2"), I know the following:

   a. Victim-2 resided in Manhattan during all relevant events described herein.

   b. On or about October 19, 2020, Victim-2 ordered a pair of designer eyeglasses from EyeglassesDepot.com.  Victim-2 was charged $197.94 for the eyeglasses.

   c. On or about October 20, 2020, that is, the day after Victim-2 placed an order on EyeglassesDepot.com, the Individual-2 Account placed an order to purchase eyeglasses on Online Marketplace-1 that were similar in description to the eyeglasses ordered by Victim-2 on EyeglassesDepot.com.  The order was placed from the Borker IP, and the shipping address provided to Online Marketplace-1 was BORKER's residence.  The product description on Online Marketplace-1 indicated that the eyeglasses were used.  The Individual-2 Account paid $79.99 for the eyeglasses.

  16. Based on my review of records from a shipping logistics company, I know that, on or about October 26, 2020,

8

EyeglassesDepot.com purchased a shipping label for purposes of sending a mailing to Victim-2's residence in Manhattan.

17. Based on my communications with Victim-2, I know the following:

a. Sometime after October 26, 2020, Victim-2 received the eyeglasses by mail to Victim-2's residence in Manhattan.

b. After receiving the eyeglasses, Victim-2 observed that they did not appear to be authentic eyeglasses from the designer. Victim-2 requested and received a refund.

18. Based on my review of the Search Warrant Returns, I know that Victim-2 received a refund of $143.99 – that is, $53.95 less than the total amount paid for the eyeglasses by Victim-2.

*Victim-3*

19. Based on my review of emails exchanged between EyeglassesDepot.com and another individual ("Victim-3"), I know that, between on or about September 26, 2020 and on or about September 29, 2020, Victim-3 exchanged emails with EyeglassesDepot.com about ordering a pair of designer eyeglasses. EyeglassesDepot.com told Victim-3 that it had a "display model" of the eyeglasses available.

20. Based on my review of the Search Warrant Returns, I know that, on or about September 29, 2020, Victim-3 placed an order on EyeglassesDepot.com. Victim-3 was charged $139.99 for the eyeglasses.

21. Based on my review of records from Online Marketplace-1, I know the following:

a. On or about September 29, 2020, that is, the same day Victim-3 placed an order on EyeglassesDepot.com, the Individual-2 Account placed an order to purchase eyeglasses on Online Marketplace-1 that were similar in description to the eyeglasses ordered by Victim-3 on EyeglassesDepot.com. The order was placed from the Borker IP. The product description on Online Marketplace-1 indicated that the eyeglasses were used. The Individual-2 Account paid 79.00 Canadian dollars for the eyeglasses, which converted to approximately $58.99.

USAO_0000345

b.    The order placed by the Individual-2 Account on Online Marketplace-1 requested that the eyeglasses be shipped to Victim-3's home address.

22.   Based on my review of online complaints and my other Postal Inspectors' conversations with over 20 customers of EyeglassesDepot.com, I know that customers of EyeglassesDepot.com have repeatedly made complaints about the website that are consistent with the experiences of Victim-1, Victim-2 and Victim-3.  In addition, based on my review of records from Online Marketplace-1, I know that, between in or about June 2020 and in or about November 2021, the Individual-2 purchased over 1,000 eyeglasses that were advertised on Online Marketplace-1 as "used."

## VITALY BORKER OPERATES EYEGLASSESDEPOT.COM

*Similarities Between EyeglassesDepot.com,*
*OpticsFast.com, and DecorMyEyes.com*

23.   Based on my review of publicly available court records, I know the following:

a.    On or about December 16, 2010, VITALY BORKER, the defendant, was charged with mail and wire fraud, cyberstalking, and making threatening communications in connection with his operation of an online eyewear business, DecorMyEyes.com.  *See* 10 Cr. 1266 (RJS) (S.D.N.Y.)  BORKER pled guilty to those crimes on or about May 12, 2011.  BORKER was sentenced to 48 months' imprisonment and three years of supervised release.

b.    On or about June 21, 2017, BORKER was charged with mail and wire fraud and conspiracy to commit mail and wire fraud, in connection with his operation of an online eyewear business, OpticsFast.com.  *See* 17 Cr. 391 (PGG) (S.D.N.Y.).  BORKER pled guilty to those crimes on or about March 20, 2018.  BORKER was sentenced to 24 months' imprisonment and three years of supervised release.[4]

c.    Following a period of incarceration at a Bureau of Prisons facility, BORKER was placed in a Residential Reentry

_____

[4] On or about February 25, 2018, prior to pleading guilty to the in 17 Cr. 391 (PGG), BORKER was found to have violated his supervised release in connection with his operation of OpticsFast.com, and was sentenced to two years' imprisonment for that violation.

USAO_0000346

Center in or around June 2020.  In or around September 2020,
BORKER was placed on home confinement.  BORKER was released from
federal custody in or about November 2020.  BORKER remains on
supervised release by the United States Probation Office.

        24.  Based on my review of customer complaints maintained
by a federal agency, I understand that individuals had filed
complaints with respect to EyeglassesDepot.com as early as in or
about May 2016.  These complaints indicated, among other things,
that after purchasing eyeglasses on EyeglassesDepot.com, the
customer began receiving communications from OpticsFast.com.
Therefore, I understand that VITALY BORKER, the defendant, may
have been operating EyeglassesDepot.com prior to June 2020,
including during the time that he was operating OpticsFast.com.
I also understand, based on my review of those customer
complaints, that the volume and frequency of complaints about
EyeglassesDepot.com increased significantly after BORKER entered
the Residential Reentry Center in June 2020.

        25.  Based on my review of the website EyeglassesDepot.com
and the website OpticsFast.com, I know that EyeglassesDepot.com
bears remarkable similarities to OpticsFast.com.
EyeglassesDepot.com uses the same layout and graphics as
OpticsFast.com, and nearly verbatim language in describing its
services.  Below on the left is a screenshot of
EyeglasesDepot.com as of February 16, 2022.  Below on the right
is a screenshot of OpticsFast.com on the same date.  Other than
changing the names of the websites and the order in which the
website's respective services are portrayed on the homepage
(i.e., "Expert Eyewear Repair Services," "Designer Sunglasses,"
"Designer Eyeglasses," and "Prescriptions in Eyeglasses and
Sunglasses"), the language used to describe each website's
services are substantively identical.

11

USAO_0000347



26.  In the course of this investigation, I have learned the following additional information suggesting common ownership and control of EyeglassesDepot.com, OpticsFast.com, and DecorMyEyes.com:

a.  Based on my communications with another Postal Inspector, I know that that Postal Inspector, while reviewing OpticsFast.com in or about June 2021, placed an item in a "shopping cart" for purchase.  Prior to purchasing the item from OpticsFast.com, that Postal Inspector visited EyeglassesDepot.com.  Upon visiting EyeglassesDepot.com, the Postal Inspector noticed that the item placed in the shopping cart at OpticsFast.com also appeared in the shopping cart at EyeglassesDepot.com, indicating an affiliation between the two websites.

12

USAO_0000348

b. Based on my review of email "header" information of an email sent to a prospective customer by the "EyeglassesDepot Sales Team" from an email account at the domain @eyeglassesdepot.com, I understand that the email address for the EyeglassesDepot Sales Team is associated with the same email domain as email accounts held for @decormyeyes.com – i.e., the website that was the subject of the criminal charges brought against VITALY BORKER, the defendant, in 2010.

c. Based on my review of records from an internet services hosting provider, I understand that the email accounts for EyeglassesDepot.com, OpticsFast.com, and DecorMyEyes.com are all associated with the same user account held at the internet services hosting provider.

*Borker Assumes the Identities of Individual-1 and Individual-2 to Operate EyeglassesDepot.com*

27. Based on my communications with the United States Probation Officer responsible for supervising VITALY BORKER, the defendant, during his term of supervised release (the "Probation Officer"), I know that BORKER has claimed to have sold his interest in EyeglassesDepot.com, DecorMyEyes.com, and OpticsFast.com to Corporation-1, and has claimed that Individual-1 is the President of Corporation-1. Specifically, I have reviewed a purported "Sales Agreement" between BORKER and Corporation-1 that BORKER provided to the Probation Officer. The Sales Agreement, which is dated November 4, 2020, states that BORKER is selling his "right, title, and interest" to six particular websites, including EyeglassesDepot.com, DecorMyEyes.com, and OpticsFast.com, to Corporation-1. The Sales Agreement further indicates that Individual-1 is the President of Corporation-1, and purports to be signed by BORKER and Individual-1.

28. While other individuals, including Individual-1, may be affiliated with and/or employed by EyeglassesDepot.com, as detailed below, VITALY BORKER, the defendant, continues to operate and manage the company.

29. Based on my review of records from Online Marketplace-1, including as noted *supra* paragraphs 14.c, 14.g, 15.c, and 21.a, the Borker IP has frequently been accessed to place orders on the Individual-2 Account at Online Marketplace-1.

30. In addition, based on my review of the Search Warrant Returns, I know that VITALY BORKER, the defendant, uses at least

13

USAO_0000349

three email Accounts ("Email Account-1," "Email Account-2," and "Email Account-3"), to operate EyeglassesDepot.com. Specifically, I know the following with respect to Email Account-1, Email Account-2, and Email Account-3:

a.   Email Account-1 is held in the name of Individual-1.  It is the email account, as described *supra* paragraph 12, which receives an email when a customer places an order on EyeglassesDepot.com.  It is also the email account used to contact EyeglassesDepot.com by certain third-party businesses that provide services to EyeglassesDepot.com, including Payment Processor-1 and a financial institution ("Bank-1").  Email Account-1 was frequently accessed from the Borker IP between at least on or about October 28, 2020 through at least on or about July 4, 2021.  The "recovery" phone number for Email Account-1, that is, the phone number which can be used to access Email Account-1 should the account holder lose access to the account, is a phone number known to belong to BORKER (the "Borker Phone Number").[5]  In addition, as detailed *infra* paragraphs 31 and 32, BORKER accesses and operates the accounts at Payment Processor-1 and Bank-1 for which Email Account-1 is the contact email address on file.

b.   Email Account-2 is the email address associated with the Phone Number, that is, the Internet-based phone number that is used to communicate with customers of EyeglassesDepot.com by text message and telephone.[6]  Email Account-2 was frequently accessed from the Borker IP between at least on or about November 15, 2020 through at least on or about July 3, 2021.  The recovery phone number for Email Account-2 is the Borker Phone Number.  The recovery email account for Email Account-2 is Email Account-3.

c.   Email Account-3 is the email address used to operate the Individual-2 Account at Online Marketplace-1.  Email Account-3 was frequently accessed from the Borker IP between at

---

[5] I know this phone number belongs to BORKER because, among other things, it is the recovery phone number for the email address that the United States Probation Office has on file as belonging to BORKER ("Email Address-4").

[6] The Phone Number is an Internet-based number which is offered as an optional additional service by the email service provider that hosts Email Account-1.  That is to say, the Phone Number and Email Account-1 are both assigned to the same account at the email service provider.

14

least on or about October 15, 2020 through at least on or about July 3, 2021.  In addition, as discussed *supra* paragraph 29, the Borker IP is commonly used to access Online Marketplace-1 to purchase eyewear that is sent to customers of EyeglassesDepot.com.[7]  The recovery phone number for Email Account-3 is the Borker Phone Number.

    31.  Based on my review of the Search Warrant Returns and records from Payment Processor-1, I have learned the following:

        a.   On or about July 30, 2020, that is, shortly after the time that VITALY BORKER, the defendant, was transferred to a Residential Reentry Center, an account was opened with Payment Processor-1 on behalf of Corporation-1.  Payment Processor-1 is used by EyeglassesDepot.com to process payments from customers.[8]

        b.   Individual-1 was identified in the account opening materials as the contact person for Corporation-1's account with Payment Processor-1.  At or around the time of account opening, Individual-1's driver's license was submitted to Payment Processor-1.  Email Account-1 was the email address provided to Payment Processor-1 in connection with this account.

        c.   While Individual-1's identity was used to create the account for Corporation-1 at Payment Processor-1, BORKER used the account in order to conduct business for EyeglassesDepot.com.  Specifically, account records reflect that the Corporation-1 account at Payment Processor-1 was frequently

---

[7] While Individual-2 is a family member of BORKER's, I know from my conversations with the Probation Officer that Individual-2 does not reside with BORKER.  Furthermore, based on publicly available information, Individual-2, who is over 80 years old, does not appear to be involved in the eyeglasses business and/or any other e-commerce business which would support the volume of activity associated with the Individual-2 Account at Online Marketplace-1.

[8] The account opening documents at Payment Processor-1 for Corporation-1 include a reference to another eyewear-related website which is among the websites purportedly sold by BORKER to Corporation-1 pursuant to the Sales Agreement.  Therefore, the Corporation-1 account at Payment Processor-1 may also be used in connection with other eyewear websites operated by BORKER in addition to EyeglassesDepot.com

15

accessed from the Borker IP between at least in or about September 2020 through at least in or about September 2021.

   d. In addition, in connection with maintaining its account at Payment Processor-1, Corporation-1 submitted proof of its inventory and business to Payment Processor-1.  The proof submitted by Corporation-1 to Payment Processor-1 included, among other things, photographs of boxes of eyeglasses.  I have compared the photographs submitted by Corporation-1 to Payment Processor-1 with photographs of BORKER's residence taken in connection with a search warrant executed at the time of a previous arrest.  I have also shown the photographs submitted by Corporation-1 to Payment Processor-1 to Postal Inspectors who were present at the time of BORKER's previous arrests at his residence.  Based on my personal comparison of the photographs and my discussions with other Postal Inspectors, I know that the photographs of eyewear inventory submitted by Corporation-1 to Payment Processor-1 were taken from inside of BORKER's residence.

  32. Based on my review of records from Bank-1, I know the following:

   a. In or about March 2019, Corporation-1 opened an account at Bank-1.  Individual-1 is listed on the signature card for the Corporation-1 account at Bank-1 as Corporation-1's President.[9]  VITALY BORKER, the defendant, is not referenced in the account records as an authorized user of the account or as otherwise affiliated with the account.

   b. The account held by Corporation-1 at Bank-1 is regularly used in furtherance of the business of EyeglassesDepot.com.  For example, the account held by Corporation-1 at Bank-1 regularly receives transfers of funds from the account held by Corporation-1 at Payment Processor-1. In other words, funds derived from payments made by customers of EyeglassesDepot.com that are processed by Payment Processor-1 are eventually transferred to the account held by Corporation-1 at Bank-1.

---

[9] The signature card was signed in March 2019.  Based on my review of BOP records, BORKER was in federal custody at the time.  Therefore, BORKER does not appear to have signed the signature card at the time of opening the account.

USAO_0000352

c.    Despite the account being held in the name of Corporation-1 and Individual-1, the account is frequently accessed by the Borker IP (and another IP address associated with BORKER's residence), including on over 2,000 occasions between on or about December 26, 2019 through on or about June 21, 2021.[10]

d.    In addition, BORKER has physically appeared at a branch of Bank-1 in Brooklyn, New York in order to deposit funds into the account held in the name of Corporation-1 at Bank-1. Below at top left is an image of BORKER taken in January 2021 and obtained from the Department of Motor Vehicles.  Below at top right is an image of BORKER accessing the account held in the name of Corporation-1 at Bank-1 on April 6, 2021. Immediately below those photographs are images of BORKER accessing the account on May 2, and May 4, 2021.





---

[10] As noted above, BORKER was in federal custody in December 2019.

USAO_0000353

33.   Therefore, I understand that VITALY BORKER, the defendant, uses Individual-1's identity to conduct business on behalf of EyeglassesDepot.com.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of VITALY BORKER, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Daniel J. Gabel with permission
_____
Postal Inspector Daniel J. Gabel
United States Postal Inspection Service

Sworn to me through the transmission of this
Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1 this 16th day of February, 2022

_____
JAMES L. COTT
United States Magistrate Judge

18

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* | )<br>)<br>)    Case No.<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____     _____
*Judge's signature*

City and state: _____     _____
*Printed name and title*

USAO_0000355

**ATTACHMENT A**

*Premises to be searched*

The SUBJECT PREMISES are particularly described as 56 Beaumont Street, Brooklyn, NY, 11235, and are a two-story brick dwelling with an attached garage, located on the west side of Beaumont Street between Shore Boulevard and Hampton Avenue.  A photograph of the SUBJECT PREMISES is included below.



## ATTACHMENT B

*Items to be seized*

The items to be seized from the SUBJECT PREMISES consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 and 2 (mail fraud), 1343 and 2 (wire fraud), and 1028A(a)(1), 1028A(b) and 2 (aggravated identity theft) (together, the "Subject Offenses") described as follows:

1. Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, identification documents, address books, AND telephone directories.

2. Evidence concerning the ownership and/or use of the electronic devices found in the Subject Premises, including sales receipts, bills for internet access, and notes in computer manuals.

3. Identification documents, correspondence, applications, loan documents, mail, account statements, bills, credit cards, financial records, and other documents in the name of, or addressed to, or referencing any person that is not a resident of the SUBJECT PREMISES, including Yevgenya Borker and Alex Volk, which may be evidence of the use of aliases in the commission of the Subject Offenses.

4. Evidence concerning the operation of EyeglassesDepot.com, OpticsFast.com, DecorMyEyes.com, or other eyewear businesses.

5. Evidence concerning the statements, representations and advertisements on the EyeglassesDepot.com website, and the falsity of such statements.

6. Data relating to the EyeglassesDepot.com website, including, but not limited to, data reflecting product postings, website modifications, transactional records, fillable forms, private messages with customers, administrator logins, and other user activity on the website.

7. Evidence concerning the link between EyeglassesDepot.com, DecorMyEyes.com, and OpticsFast.com.

8. Documents referencing the names and employment of employees of EyeglassesDepot.com.

9. Evidence concerning any eyeglasses inventory or merchandise, including but not limited to eyewear and contact lenses.

10. Documents relating to customers or prospective customers of EyeglassesDepot.com, including lists of customers, communications with customers, records of complaints and/or disputes by or about customers or prospective customers.

11. Documents relating to vendors, suppliers, or sellers of goods to EyeglassesDepot.com, including lists of vendors or sellers, communications with vendors or sellers, and records of complaints and/or disputes by or about vendors or sellers.

12. Financial records, including books, ledgers, credit card bills, and financial instruments related to EyeglassesDepot.com, OpticsFast.com, DecorMyEyes.com, or other eyewear businesses.

13. Luxury or designer eyewear that appears to be counterfeit.

14. Computer devices, storage media, and related electronic equipment used to access, transmit, or store information relating to the Subject Offenses.

15. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from computer devices, storage media, and related electronic equipment.

16. Documents reflecting email accounts and/or websites associated with Vitaly Borker.

17. Any safes, key-lock strong boxes, and other types of locked or closed containers that may contain any of the items described immediately above, which will be opened and searched at the Subject Premises if feasible.

If it is determined that one or more of electronic devices covered by this warrant can be enabled or unlocked with "Touch ID" or other biometric unlocking features, law enforcement officers are authorized to press the fingers (including thumbs) of VITALY BORKER ("BORKER") to the Touch ID sensor of the electronic device, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants. If it is determined that one or more of the electronic devices can be enabled with facial recognition, law enforcement officers will be authorized to hold the device to the face of BORKER and hold BORKER's face for the purpose of attempting to unlock the device via recognition in order to search the contents as authorized by this warrant.

2

USAO_0000358

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

USAO_0000359