**21 MAG 6772**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with the Google Voice Call
Number 718-635-3888 and Various
Email Accounts maintained at
Premises Controlled by Google LLC,
USAO Reference No. 2021R00452

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK          )
                                          ) ss.
COUNTY OF NEW YORK   )

SHABEKA C. BENT, United States Postal Inspector, United States Postal Inspection
Service, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Postal Inspector with the United States Postal Inspection Service (the "USPIS"). I have been a Postal Inspector with the USPIS since 2016, and am assigned to the New York Division, where I investigate mail fraud and other crimes. I have conducted investigations into various forms of online criminal activity and am familiar with the ways in which such crimes are commonly conducted. I have also received training regarding mail and internet fraud. I have conducted or participated in surveillance operations, including electronic surveillance of social media and networking sites. Further, I have reviewed the contents of email accounts and related data on numerous occasions and have participated in the analysis of data returned from providers pursuant to warrants for such accounts.

**B.  The Provider, the Subject Accounts and the Subject Offenses**

1.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the Google Voice call number 718-635-3888 ("Subject Account-1") and the email accounts emalishcorp@gmail.com ("Subject Account-2"), eyeweardepotinc@gmail.com ("Subject Account-3"), and vitoborker@gmail.com ("Subject Account-4," and collectively with Subject Account-1, Subject Account-2, and Subject Account-3, the "Subject Accounts").  The Subject Accounts are maintained and controlled by Google LLC (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

2.  As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 2261A (cyberstalking), and 3583 (violation of supervised release) (collectively, the "Subject Offenses").

3.  This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with victims and other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C.  Services and Records of the Provider**

4.  From my training, experience, and review of publicly available information, I have learned the following, among other things, about the Provider:

12.06.2018

USAO_0000361

a.   The Provider offers email services to the public. In particular, the Provider allows subscribers to maintain email accounts under the domain name gmail.com. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.  In addition, the Provider offers a service called Google Voice through which an account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline.

b.   The Provider maintains the following records and information with respect to every subscriber account:

i.   *Email contents and Instant Message Content*. In general, any email (which can include attachments such as documents, images, and videos) or instant message sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email or instant message. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email or instant message, it may continue to be available on the Provider's servers for a certain period of time. Google offers instant message functionality, in part, through Google Hangouts.

ii.   *Address book.* The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.   *Calendar.* The Providers allow subscribers to maintain calendar entries, including appointments, events, and meetings, as well as task lists that can be shared and viewed amongst users. Google offers calendar functionality through Google Calendar.

12.06.2018

USAO_0000362

iv.     *Document Management.* Google allows online storage "drives," on which subscribers can store, access, and share data and documents. Google offers document manage functionality through Google Drive.

v.     *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services used by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number. Google offers payment functionality, in part, through Google Pay.

vi.     *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its systems. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

vii.     *Customer correspondence.* The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

viii.     *Preserved and backup records.* The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its

12.06.2018

USAO_0000363

own data retention policy. As described below, the Government previously served a preservation request on the Provider for the Subject Accounts.

ix.    Google also offers other services, such as storage of browsing history, locations history, and tools related to the administration of user-created websites. In my training and experience, information from these other services may constitute evidence of the crimes under investigation because, for example, the information can be used to identify the account's user or users.

x.    Google provides a service through which a computer user can search web pages for text that the user types in, and, under some circumstances, Google saves the user's text searches for later retrieval. Google may also keep records of the webpages or IP addresses that a user clicks on or types directly into his or her web browser's address bar (as opposed to Google's search bar), if the user is using Google's web browser (Google "Chrome") and has logged into Google Chrome with his Google account's username and password.

xi.    Google uses different names to identify the many services it offers. These include: Account Activity, Chrome, Gmail, Google Calendar, Google Cloud Platform, Google Docs, Google Drive, Google Maps, Google+, Google Hangouts, Google Voice, Google Talk, Google Wallet, Picasa, Panoramio, Web Search, Web History, YouTube, and iGoogle.

**D.  Jurisdiction and Authority to Issue Warrant**

5.  Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

12.06.2018

USAO_0000364

6.   A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

<u>Background Regarding Vitaly Borker</u>

8.   As relevant to this application, the U.S. Postal Inspection Service is investigating commission of the Subject Offenses by Vitaly Borker ("BORKER" or the "Target Subject"), including violations of BORKER's supervised release.

9.   Based on my participation in this investigation and review of public records, I have learned the following:

a.   On December 16, 2010, BORKER was indicted by a grand jury sitting in the Southern District of New York with a four-count indictment ("Indictment I") charging cyberstalking in violation of 18 U.S.C. § 2261A(2), threatening interstate communications in violation of 18 U.S.C. § 875(c), mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.   As detailed in the December 3, 2010 criminal complaint ("Complaint I"), which is attached hereto and incorporated by reference herein, BORKER engaged

12.06.2018

USAO_0000365

in this conduct through his ownership and use of a website called DecorMyEyes.com, which was in the business of selling eyewear and providing services relating thereto.

b. BORKER pled guilty to the four counts in the indictment on May 13, 2011, and was sentenced to 48 months imprisonment.

c. On June 21, 2017, BORKER was indicted by a grand jury sitting in the Southern District of New York in a three-count indictment ("Indictment II") charging conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.  As detailed in the May 19, 2017 criminal complaint ("Complaint II"), which is attached hereto and incorporated by reference herein, BORKER engaged in this conduct through his ownership and use of a website called OpticsFast.com, which, similar to DecorMyEyes, was also in the business of selling eyewear and providing services relating thereto.

d. BORKER pled guilty to the three counts in Indictment II on March 20, 2018, and was sentenced to 24 months imprisonment.

e. On or about July 15, 2020, BORKER entered a halfway house in advance of his release from federal custody.  Based on my conversations with a United States Probation Officer assigned to BORKER's case, I understand that, while at the halfway house, BORKER had access to email.

f. On or about November 12, 2020, BORKER was released from federal custody. Pursuant to his conditions of supervised release, during his three-year period of supervised release, BORKER is "not to be involved – whether as an employer, an employee, a partner, an investor, a consultant, through a corporation, partnership, or joint venture, or in any other fashion – with an e-commerce retail business in which products or services are sold to consumers."

12.06.2018

USAO_0000366

EyeglassesDepot.com

10. During my participation in this investigation, I have become aware of an e-commerce website engaged in selling and repairing eyewear called EyeglassesDepot.com.

11. Based on my review of EyeglassesDepot.com, I understand that it is nearly identical to OpticsFast.com, the website which was the basis of the Indictment against BORKER in 2017. Specifically, EyeglassesDepot.com uses the same layout and graphics as OpticsFast.com, and nearly verbatim language in describing their services. Below on the left is a screenshot of eyeglassesdepot.com as of June 14, 2021. Below on the right is a screenshot of opticsfast.com.

 

8

USAO_0000367

12. In addition, based on my review of the "header" information of an email purportedly sent from the "EyeglassesDepot Sales Team" at sales@eyeglassesdepot.com to a customer of EyeglassesDepot.com, I understand that the message ID indicates that the email was sent from the same email as @decormyeyes.com – i.e., the website that was the subject of BORKER's 2010 arrest.

13. Based on my review of customer complaints posted online and conversations with customers and potential customers of EyeglassesDepot.com, I understand that, beginning on or around August 2020, a number of customers of EyeglassesDepot.com have complained about potentially fraudulent and harassing activity after using or attempting to use its services.  For example:

a.   Based on my communications with a customer ("Customer-1") and my review of text messages and emails provided by Customer-1, I understand that, in or around November 2020, Customer-1 ordered sunglasses on EyeglassesDepot.com.  Shortly thereafter, Customer-1 was told in an email by someone claiming to be named "Sam" at EyeglassesDepot.com[1] that the item selected by Customer-1 had a "small crack on the frame" and that the website was "not comfortable in sending the defective item."  In that email, Sam suggested that Customer-1 select another item.  After some additional correspondence from "Sam" and another customer service representative claiming to be named "Arsenio," in which Customer-1 inquired about other glasses but never placed an order, EyeglassesDepot.com charged Customer-1 for glasses that Customer-1 had not purchased and shipped the glasses to her.  EyeglassesDepot.com then requested that "Customer-1"return the glasses and, when Customer-1 did not promptly respond to messages from

---

[1] Unless otherwise stated, all emails from EyeglassesDepot.com were sent by the email address sales@eyeglassesdepot.com, and not any of the Subject Accounts.

12.06.2018

USAO_0000368

EyeglassesDepot.com, "Customer-1" began receiving numerous unsolicited text messages and calls to "Customer-1"cellphone.  The text messages were sent from Subject Account-1.

       b.  Based on my communications with another customer ("Customer-2"), I understand that the customer purchased a pair of Chanel-branded sunglasses for over $300.  Upon receipt of the merchandise, Customer-2 recognized that glasses were not what Customer-2 ordered and did not arrive with a certificate of authenticity, as EyeglassesDepot.com had indicated that it would on its website.  Customer-2 was advised by EyeglassesDepot.com that the glasses Customer-2 ordered were discontinued and that Customer-2 should keep the ones that she had been sent for a discount.  Following several email exchanges between "Sam," "Arsenio," and Customer-2, Customer-2 posted a negative review about EyeglassesDepot.com on a public website.  EyeglassesDepot.com refused to accept the merchandise as a return and, instead, sent numerous emails and text messages insisting that Customer-2 remove the negative review.

       c.  Based on my communications with a third customer ("Customer-3"), I understand that, in or around April 2021, Customer-3 inquired with EyeglassesDepot.com about repairing a pair of glasses.  Before sending in the glasses, Customer-3 asked for a price estimate for a specific service that an individual identifying himself as "Arsenio" said could be handled for the customer "with ease" and a photograph of the product that would be used to provide the service. Arsenio replied that he would estimate "$45" and added that "we do not send pictures and do any work until the item is here."  Customer-3 replied that she did not want to proceed with the order. Arsenio then informed her that a shipping label was purchased for Customer-3, and that Customer-3 therefore owed $9.99.  When Customer-3 refused to pay the $9.99, Arsenio sent her numerous

10

12.06.2018

USAO_0000369

emails harassing the customer for payment and threatening to send her information to a debt collector.[2]

Probable Cause that Subject Account-1 Contains Evidence of the Subject Offenses

14. Based on my communications with customers and potential customers of EyeglassesDepot.com, I understand that Subject Account-1 was used to contact Customer-1, as noted in Paragraph 13.a *supra*.

15. In addition, when I personally accessed OpticsFast.com and EyeglassesDepot.com in the course of my participation in this investigation, I received an unsolicited phone call from Subject Account-1. The person calling from Subject Account-1 identified herself as "Melissa" from EyeglassesDepot.com.[3]

16. Therefore, I believe that Subject Account-1 will contain evidence, fruits, and instrumentalities of the Subject Offenses.

---

[2] This practice is remarkably similar to one conducted by OpticsFast.com. As detailed at paragraph 6 of Complaint II:

"I have also reviewed complaints by prospective customers of OpticsFast who were sent purportedly 'free' United States Postal Service shipping labels by OpticsFast. Based on my review of customer complaints, and my conversations with law enforcement agents who have spoken to individuals who received these shipping labels from OpticsFast, I have learned that after prospective customers have filled out a form on OpticsFast.com to get a quote for eyewear, replacement lenses, or repairs, OpticsFast has sent a shipping label instead of a quote. These prospective customers did not request the shipping label and did not use it. Nonetheless, OpticsFast began contacting them through emails and by text message, requesting that they pay approximately $6 for the shipping label. When prospective customers have refused, OpticsFast has retaliated with harassment and threats of referring the matter to a debt collector…"

[3] I initially personally accessed OpticsFast.com. However, when I placed an item in my shopping cart on OpticsFast.com, I noticed that the item also appeared in my shopping cart when I then went to EyeglassesDepot.com.

12.06.2018

USAO_0000370

<u>Probable Cause that Subject Account-2 Contains Evidence of the Subject Offenses</u>

17. Based on my training and experience and participation in this investigation, I believe that Subject Account-2 is operated by BORKER and that Subject Account-2 has been used in furtherance of the Subject Offenses.

18. Based on subpoena returns and communications with an online payment company, I understand that a user of the online payment company's services has used the online payment company to send money to third parties in exchange for eyewear.  That user has identified Subject Account-2 as his or her email address.  On many occasions, including as recently as May 18, 2021, the orders placed with that online payment company and paid for by the individual associated with Subject Account-2 requested that the eyewear be sent to an address that I know based on conversations with the Probation Officer assigned to supervise BORKER to be the home address of Yevgenya Borker, BORKER's 83-year-old mother.  On other occasions, including as recently as May 20, 2021, orders placed and paid for by the individual who identified Subject Account-2 as his or her contact address requested that the eyewear be sent to a third party, but the following message was added, in sum and substance (typos and capitalization in original):

> "Can you please do a favor and ship this item to the following address WITH SIGNATURE CONFIRMATION so it doesnt get lost?? : [address] The item is a GIFT and I would like to surprise this person.  Please ship with NO INVOICE and NO RECIEPT.  I waited until last minute and now I would be very happy it you can ship right away."

19. Based on subpoena returns, I have also learned that Subject Account-2 has been accessed by an IP address associated with a residential address in Brooklyn, New York.  Based on

12.06.2018

USAO_0000371

my communications with the Probation Officer assigned to supervise Borker, I understand that address to be BORKER's residence.

20. In addition, based on my review of public records, I have learned that Emalish Corp. – the name of which is contained in the text of Subject Account 2 – and "Vito Borker" were defendants in a civil lawsuit in the Central District of California in 2010 alleging, among other things, that BORKER and another individual operated Emalish Corp. *See Ashton Optical Imports, Inc. v. Emalish Corp.*, 10-cv-06355-ODW (C.D. Cal. 2010).

21. Therefore, I believe that Subject Account-2 is used by BORKER to acquire and sell eyeglasses in furtherance of the Subject Offenses, and that there is probable cause to believe that Subject Account-2 will contain evidence, fruits, and instrumentalities of the Subject Offenses.

Probable Cause that Subject Account-3 and Subject Account-4 Contain Evidence of the Subject Offenses

22. Based on subpoena returns, I understand that EyeglassesDepot.com uses the services of a website servicing company called Cloudflare.

23. Based on subpoena returns, I understand that, as recently as May 15, 2021, Subject Account-3 was used to log in to the Cloudflare account for EyeglassesDepot.com. This log-in occurred at an IP address which, based on subpoena returns, I understand to be a residential address in Brooklyn, New York. Based on conversations with the Probation Officer assigned to supervise BORKER, I understand this address to be to be BORKER's residence.

24. In addition, based on subpoena returns, I understand that, prior to May 3, 2021, Subject Account-4 had been the customer email on record with Cloudflare for EyeglassesDepot.com. On May 3, 2021, the Cloudflare account was accessed from the IP address known to be associated

12.06.2018

USAO_0000372

with BORKER's residence and changed the customer email on record with Cloudflare from Subject Account-4 to Subject Account-3.[4]

25. Therefore, based on my training and experience and participation in this investigation, I believe that Subject Account-3 and Subject Account-4 have both been used to operate EyeglassesDepot.com, and that both accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses.

**B. Evidence, Fruits and Instrumentalities**

26. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

27. In particular, for the time period of July 15, 2020 (the date that BORKER entered a halfway house following his term of incarceration as a result of the 2017 indictment) to the present, I believe the Subject Accounts are likely to contain the following evidence of the Subject Offenses:

    a. evidence that the Subject Accounts are operated by Vitaly Borker and used in connection with e-commerce relating to the selling and repairing of eyewear and other services related thereto;

    b. evidence of the procurement and/or sale of counterfeit eyewear and of BORKER or any co-conspirator's knowledge that such eyewear was counterfeit;

    c. evidence of fraudulent quotations for eyeglass repair or false claims for shipping reimbursement;

---

[4] I also understand that Subject Account-4 is BORKER's personal email address, as provided by BORKER to the Probation Officer supervising him following his release from the halfway house in November 2020.

12.06.2018

USAO_0000373

d. evidence of threats or harassment of customers who failed to receive correct orders; failed to pay for purported shipping expenses; or publicly criticized eyeglassesdepot.com;

e. evidence of motive relating to the Subject Offenses, including financial need or gain;

f. geographic location of user, computer, or device (the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location); and

g. identities and locations of any co-conspirators.

**III. Review of the Information Obtained Pursuant to the Warrant**

28. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

29. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is

15

12.06.2018

USAO_0000374

analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Request for Non-Disclosure and Sealing Order

30. The scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. As is set forth above in Paragraphs 8-25, the target of this investigation is known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. See 18 U.S.C. § 2705(b)(3).

31. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to

12.06.2018

USAO_0000375

notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

32. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V. Conclusion**

33. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

/s/ Shabeka C. Bent with permission
_____
Shabeka C. Bent
U.S. Postal Inspector
U.S. Postal Inspection Service

Sworn to before me by reliable electronic means,
Pursuant to Federal Rules of Criminal Procedure 41(d)(3)
and 4.1, this ___7___ day of July, 2021

_____
JAMES L. COTT
United States Magistrate Judge

12.06.2018

17

USAO_0000376

Exhibits – December 3, 2010 & May 19, 2017 Criminal Complaints

12.06.2018

USAO_0000377

10 MAG 2717

Approved: _____
          E. Danya Perry
          Assistant United States Attorney

Before:      THE HONORABLE RONALD L. ELLIS
             United States Magistrate Judge
             Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**

          - v. -                  :      Violations of
                                         18 U.S.C. §§ 2261A(2),
                                  :      875(c), 1341, 1343, 2

VITALY BORKER,                    :
     a/k/a "Tony Russo,"
     a/k/a "Stanley Bolds,"       :

                                  :      COUNTY OF OFFENSE:
               Defendant.                NEW YORK
                                  :

- - - - - - - - - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        DOUGLAS G. VEATCH, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and charges as follows:

COUNT ONE
(Cyberstalking)

        1.      From at least in or about January 2007, up to and including in or about December 2010, in the Southern District of New York and elsewhere, VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, unlawfully, willfully, and knowingly, with the intent to kill, injure, harass, and place under surveillance with intent to kill, injure, harass, and intimidate, and to cause substantial emotional distress to a person in another State and tribal jurisdiction and within the special maritime and territorial jurisdiction of the United States, and to place that person in reasonable fear of the death of, and serious bodily injury to that person, a member of that person's immediate family, and a spouse and intimate partner of that person, used the mail, interactive computer services, and facilities of interstate and foreign commerce to engage in a course of conduct that caused substantial emotional distress to that person and placed that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described above, to wit, BORKER communicated with, and threatened, numerous customers of his retail luxury eyewear website, "DecorMyEyes.com," via email and telephone in interstate

1

USAO_0000378

and foreign commerce, in order to harass, intimidate, and injure such victims, and to cause such victims substantial emotional distress.

(Title 18, United States Code, Section 2261A(2).)

## COUNT TWO

(Threatening Interstate Communications)

2.      From at least in or about January 2007, up to and including in or about December 2010, in the Southern District of New York and elsewhere, VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, unlawfully, willfully, and knowingly transmitted, in interstate and foreign commerce, communications containing threats to injure the person of another, to wit, BORKER communicated with, and threatened, numerous customers of his retail luxury eyewear website, "DecorMyEyes.com," via email and telephone in interstate and foreign commerce, in order to harass, intimidate, and injure such victims, and to cause such victims substantial emotional distress.

(Title 18, United States Code, Section 875(c).)

## COUNT THREE

(Mail Fraud)

3.      From at least in or about January 2007, up to and including in or about December 2010, in the Southern District of New York and elsewhere, VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, placed in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and took and received therefrom such matters and things, and knowingly caused such matters and things to be delivered by mail and by such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, to wit, among other things, BORKER engaged in a scheme to defraud customers of his retail luxury eyewear website, "DecorMyEyes.com," by misrepresenting the authenticity and condition of merchandise he sold and mailed to such customers, and at times making unauthorized charges to customers' accounts and/or retaining their paid merchandise.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT FOUR

(Wire Fraud)

4.      From at least in or about January 2007, up to and including in or about December 2010, in the Southern District of New York and elsewhere, VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises,

2

did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, among other things, in electronic and telephonic communications, BORKER engaged in a scheme to defraud customers of his retail luxury eyewear website, "DecorMyEyes.com," by misrepresenting the authenticity and condition of merchandise he sold and mailed to such customers, and at times making unauthorized charges to customers' accounts and/or retaining their paid merchandise.

(Title 18, United States Code, Sections 1343 and 2.)

5.     I am a Postal Inspector with the USPIS in the New York Division. I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with other law enforcement officers and agents, my interviews of witnesses, and my examination of documents, reports and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6.     Based upon my investigation to date, I am aware that "DecorMyEyes.com" is an online retailer of purported luxury eyewear, based in Brooklyn, New York. I believe that both "Tony Russo" and "Stanley Bolds" are aliases used by VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, who is the sole owner and operator of DecorMyEyes (according to witnesses with whom I have spoken, BORKER also has a female employee or employees who occasionally answer phones and respond to emails). Thus, where statements are attributed to BORKER herein, they were made to victims by the individual whom I believe to be BORKER, who used either the alias "Tony Russo" or "Stanley Bolds" when communicating with customers. Among other reasons, the bases for my belief that these aliases are used by BORKER include:

a.     I have read an article published in the New York Times on or about November 26, 2010, in which BORKER appears effectively to have admitted using the alias "Tony Russo." In this same article, BORKER is quoted as explaining the business reasons for his conduct, essentially reasoning that the more negative comments DecorMyEyes receives, the higher its ranking on Internet search engines, and the more business it will do.

b.     Other law enforcement agents and I have spoken with a number of victims, and I have also reviewed complaints filed with the Federal Trade Commission by well over 200 victims in many states within the United States as well as in countries abroad, each of whom made online purchases from DecorMyEyes.com. From my review of these complaints, a distinct pattern emerges: generally, many customers stated that they purchased eyewear from the website; that it was defective or appeared to be counterfeit; that they tried to return or exchange it; that a campaign of aggressive, obscene, and intimidating conduct followed from a representative of DecorMyEyes.com; and that, on many occasions, unauthorized payments (such as a twenty percent "restocking fee") were assessed, or the customers were not reimbursed for returned or unfulfilled orders, or the customers were never sent merchandise for which they had

3

been charged. The earlier complaints, dating from in or about January 2007 to in, roughly, or about mid-2009, generally identified "Stanley Bolds" as the perpetrator of this conduct, while later complaints, from roughly in or about mid-2009 to in or about December 2010, identified "Tony Russo." However, the *modus operandi* is identical throughout, with the same pattern of threats and abuse no matter whether the issuer identified himself as "Stanley Bolds" or "Tony Russo." For example, many customers received remarkably similar, profanity-laced threats from "Stanley Bolds" and "Tony Russo" alike that, among other things, he had their personal information, he knew where they lived, and he would visit horrific violence upon the complaining customers and their close family members. Several customers referred to the perpetrator of the conduct as BORKER.

        c.    I have reviewed an email exchange between a customer of DecorMyEyes.com (identified herein as "Victim-5") and the representative identifying himself as "Tony Russo," dated on or about November 10, 2010. In that email, Victim-5 communicated that he had learned that "Vito (Vitaly) Borker[]" used the different aliases of "Stanley Bolds" and "Tony Russo," and asked if he were living in Indonesia because he "had to flee the US??" In response, far from denying his true identity, and that he used those aliases, BORKER replied only that he has "been living here for many years now."

        d.    According to property tax and other documents I have reviewed, the address listed on DecorMyEyes.com is owned by BORKER.

        7.    I have reviewed dozens of email communications between VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, and customers of DecorMyEyes.com. The tag line on each of these emails from DecorMyEyes.com is as follows: "These items are 100% brand new and Authentic, direct from the manufacturer. They come complete with certificate of authenticity, protective case and dust cloth. Every product is exactly as pictured. We own several stores around the country so there are no issues with authenticity. Our prices are much lower then the average retail location as we don't have to pay rent. Our site is the best place to buy sunglasses online. Our Prices are the lowest!!" Based upon the conversations that other law enforcement agents and I have had with many customers of DecorMyEyes.com, and the hundreds of complaints filed with the Federal Trade Commission that I have reviewed, the above-cited representation is false, in that, among other things, the eyewear was often defective, damaged, used, counterfeit, and/or did not come with any "certificate of authenticity."

        8.    I have spoken with a customer who resides in Long Island, New York, who purchased designer eyewear from DecorMyEyes in or about 2007 or 2008, for approximately $200 ("Victim-1"). Victim-1 was dissatisfied with her service and attempted to cancel the order, and a dispute ensued with VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, over an unauthorized fee charged by DecorMyEyes.com to Victim-1's credit card. In a series of threatening phone conversations, BORKER described Victim-1 to Victim-1's husband as a "fucking whore," and threatened to "come after" and to "get" Victim-1 and her husband, in such a way as to make Victim-1 fear for her life and that of her husband. Although BORKER also told Victim-1 and her husband that he had sued them, they subsequently learned that this was untrue.

USAO_0000381

9.     I have spoken with a customer who resides in Manhattan, New York, who purchased merchandise from DecorMyEyes.com ("Victim-2"). I have also reviewed communications between Victim-2 and VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, both in the form of email messages and on voicemail messages. Based upon the foregoing, I am aware that:

a.     On or about July 27, 2010, Victim-2 placed an order for a pair of luxury prescription eyeglasses and some contact lenses with DecorMyEyes.com. At that time, she spoke with a DecorMyEyes.com representative via online chat, who informed her that the contact lenses were in stock, but that the eyeglasses would arrive in two weeks' time because they were going to be shipped from France. Victim-2 authorized DecorMyEyes.com to charge $361.97 to her credit card for the merchandise.

b.     On or about July 28, 2010, BORKER telephoned Victim-2, and instructed her to choose a different type of contact lenses, as the ones she had ordered had been discontinued. Victim-2 instead requested a refund, much to BORKER's apparent aggravation.

c.     On or about August 2, 2010, Victim-2 received the eyeglasses at her residence in Manhattan via a private mail carrier service. The eyeglasses were defective, appeared to be counterfeit, and were missing the prescription lenses Victim-2 had ordered. Victim-2 then noticed that a payment of $481.96 had been charged to her credit card. In a phone conversation later that day, when Victim-2 expressed concern about the eyeglasses and the unauthorized charge to her credit card, BORKER responded with abuse and threats of violence, specifically stating that he knew Victim-2's address, that he was only one bridge away, and that he would come to Victim-2's residence and "fuck [her] up the ass." After Victim-2 hung up the telephone, BORKER continued repeatedly to call Victim-2, including well into the night.

d.     On or about August 3, 2010, Victim-2 mailed the eyeglasses to the address in Brooklyn, New York listed on DecorMyEyes.com. On the same day, she disputed the charges with her credit card company.

e.     Beginning on or about September 23, 2010 (shortly before the time when DecorMyEyes.com would no longer be able to contest the dispute under the credit card company's rules), BORKER began again to repeatedly call Victim-2, using a blocked phone number. On or about September 27, 2010, "Tony Russo" left a voicemail message for Victim-2, which I have heard, replete with obscenities about the "fucking dispute" she had filed with her credit card company, and threatening to drag her into court for having "fucking stole[n]" the eyeglasses from him. On that same day, Victim-2 also spoke with BORKER on the telephone, hanging up on him when he threatened her with physical harm. Also on the same day, BORKER emailed Victim-2 with a document purporting to show a court date and docket number for a small claims action he had filed against her. Victim-2 later learned – and BORKER admitted to her – that this document had been falsified, and that no such claim had been filed against her.

f.     Also on or about September 27, 2010, BORKER sent an email to Victim-2 that included information personal to Victim-2, and attached a photograph of the outside of Victim-2's residence. Victim-2 continued to receive calls from a blocked number well into the night and over the next week.

5

USAO_0000382

g.     On or about September 29, 2010, Victim-2 posted a negative review of DecorMyEyes.com on a complaint board, which contained hundreds of similar complaints against DecorMyEyes.com. A short while later, BORKER forwarded that same review to Victim-2, and wrote that she should "[c]lose the dispute with the credit card company if you know whats good for you." The email stated that he would cause her "financial problems" but went on to state: "Do the right thing and everyone goes away. I AM WATCHING YOU!"

h.     BORKER refunded Victim-2 for the cost of the contact lenses she had ordered but never received. Yet BORKER continued to claim – falsely -- that Victim-2 had never returned the counterfeit glasses, and thus refused to credit her the payment she had made for those glasses. Eventually, Victim-2's credit card company credited this payment back to Victim-2's card.

i.     The result of the threatening electronic and telephonic communications by BORKER has been to cause Victim-2 extreme emotional distress and fear of injury or death. Each of the above-described communications occurred while Victim-2 was in Manhattan, New York.

10.     I have spoken with another customer who resides in Manhattan, New York and who purchased eyewear from DecorMyEyes.com, on or about June 18, 2010 ("Victim-3"). I have also read a recitation of her dealings with VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, and have reviewed certain email correspondence between them, all of which Victim-3 has verified as accurate. Based upon the foregoing, I am aware that Victim-3 had purchased a pair of designer sunglasses for approximately $350 through DecorMyEyes.com in or about June 2010. When she still had not received them several weeks after placing the order, she called DecorMyEyes.com and spoke to BORKER, who called her a "stupid bitch" and a "cheap Jew," and stated that he knew where Victim-3 lived and could make her life a living hell. Victim-3 later spoke again with BORKER who stated that the sunglasses she had ordered were out of stock and that she would have to pay a twenty percent "restocking fee." Victim-3 later did receive a pair of sunglasses via mail, but they appeared to be counterfeit. Victim-3 thereafter confirmed with a legitimate eyewear retailer that the sunglasses she had received were fake and returned the sunglasses to DecorMyEyes.com. After an email exchange with BORKER in which Victim-3 stated her intention to report him to the New York Department of Consumer Affairs, BORKER sent back an email that read: "PS: don't forget that I know where you live as well." BORKER subsequently began calling Victim-3 repeatedly, often in the middle of the night, stating that he was watching her and threatening to "kick her ass," rape her, and "fuck [her] in the ass." Several months later, DecorMyEyes did refund Victim-3 the cost of her sunglasses. The result of the threatening electronic and telephonic communications initiated by BORKER has been to cause Victim-3 extreme emotional distress and fear of injury or death. The above-described communications generally occurred while Victim-3 was in Manhattan, New York.

11.     I have spoken with another customer who resides in New Jersey and works in Manhattan, New York, and who purchased designer eyewear from DecorMyEyes.com, in or about June or July 2010 ("Victim-4"), which were mailed to Victim-4 through the United States Postal Service. I have also read descriptions of Victim-4's dealings with VITALY

6

BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, the accuracy of which Victim-4 has confirmed. Based upon the foregoing, I am aware that when Victim-4 attempted to return the frames, BORKER informed him, in a telephone call, that Victim-4 would have to pay a $57 "restocking fee" – despite earlier assurances to Victim-4 that no fees would apply. When Victim-4 stated that he would file complaints with the Federal Trade Commission and with an Internet search engine that had highly ranked the website, BORKER thereafter threatened Victim-4, stating "I know where you work" and "I can hurt you." BORKER also sent a broadcast email to individuals within the company where Victim-4 worked, which was routed through servers in Maryland, falsely accusing Victim-4 of engaging in narcotics sales and homosexual practices. Certain of the above-described communications, which greatly frightened Victim-4, occurred while Victim-4 was in Manhattan, New York.

  12.  Other law enforcement agents and I have spoken with several customers who purchased designer eyewear from DecorMyEyes.com who were defrauded as a result of misrepresentations made to them by VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant. I have also reviewed documents containing communications between such victims and BORKER, which the victims have confirmed to be accurate. Based upon these conversations and these documents, I am aware that:

  a.  On or about June 22, 2010, BORKER emailed an individual who had purchased a pair of luxury sunglasses ("Victim-5") on or about August 31, 2009, inquiring if Victim-5 would be interested in selling those sunglasses back to DecorMyEyes.com (because another customer wished to buy this particular model, which had since been discontinued), in exchange for a new pair of luxury sunglasses. Victim-5 agreed and shipped the sunglasses to an overseas address provided to him by BORKER; however, despite repeated efforts, Victim-5 was never given payment or the new pair of sunglasses as promised.

  b.  In or about October 2010, a victim who resides in Colorado ("Victim-6") shipped two pairs of broken eyeglasses to DecorMyEyes.com for repair. Victim-6 subsequently received an email stating that the glasses were "unfixable" and was told that he would be required to pay a fee of $12.95 to have the broken glasses sent back to him. When BORKER later agreed to ship the frames back to Victim-6 if Victim-6 paid the postage, Victim-6 duly sent a pre-paid United States Postal Service label to BORKER. However, BORKER never returned the frames to Victim-6. When Victim-6 complained and stated that he would post negative comments about DecorMyEyes.com on consumer websites, BORKER stated, in an email sent on or about October 27, 2010, that he was instructing his assistant to "crush" the glasses and then "take the pieces of what is left of his glasses and use the label he sent to ship the powder back to him," and told Victim-6 to "GO FUCK YOURSELF COCKSUCKER... I pee on your negative [comments]. Now you lost your glasse [sic] bitch!" In another email on the same day, BORKER referred to "cockers like you who I shit on... Please drop dead ok?" In another email the same day, entitled "LICK MY ASSHOLE," BORKER attached a vulgar and obscene photograph (relating broadly to the subject line's invitation) to an email sent to Victim-6. In an email dated November 10, 2010, BORKER followed a string of obscenities with the statement: "I hope you fall off a ladder and break your head."

  c.  In or about October 2010, a customer ("Victim-7") shipped broken eyeglasses, worth approximately $150, to DecorMyEyes.com for repair. Despite many emails

USAO_0000384

begging for assistance, and abusive responsive emails from BORKER, the glasses were never returned to Victim-7.

13.    Other law enforcement agents have spoken with the mail carrier who delivers mail to the Brooklyn address listed for returns on the DecorMyEyes.com website. Based upon that, I am aware that, typically, many parcels are delivered on a daily basis to that address, and that VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, also receives mail at that address. Based upon my conversations with customers, my review of documents, and my familiarity with DecorMyEyes.com, I am aware that eyewear is not shipped from this Brooklyn address, and thus I believe that the daily parcels that are delivered there are returns from dissatisfied customers. I have read a November 26, 2010 New York Times article about DecorMyEyes.com, in which BORKER is quoted as estimating that he, at that time, had in his home-office approximately $500,000 in returned inventory, and the article notes that each of the hundreds of eyeglasses in the office "represents lost revenue and a brawl."

14.    I am aware that civil and criminal complaints have been filed against VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, based on his longstanding practice of defrauding and intimidating customers. For example, I am aware that BORKER was sued in a 2006 civil case filed in federal district court for the Southern District of New York by luxury brands who alleged trademark infringement due to BORKER's sale of counterfeit goods. I have seen settlement documents filed in that case on or about September 6, 2007, signed by BORKER, in which he agreed to pay a $300,000 judgment and agreed to cease his infringing conduct.

8

USAO_0000385

WHEREFORE, deponent asks that a warrant be issued for the arrest of VITALY BORKER, a/k/a "Tony Russo," a/k/a "Stanley Bolds," the defendant, and that he be imprisoned or bailed, as the case may be.

DOUGLAS G. VEATCH
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
3rd day of December, 2010

THE HONORABLE RONALD L. ELLIS
CHIEF UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

9

17 MAG . 3815

Approved:  *Nick Landsman Roos*
          NICOLAS LANDSMAN-ROOS
          DANIELLE SASSOON
          Assistant United States Attorneys

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - x
                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA    :
                    :   Violation of
    - v. -          :   18 U.S.C. §§ 1341
                    :   1343, and 2
VITALY BORKER,        :
                    :   COUNTY OF OFFENSE:
        Defendant.   :   NEW YORK
                    :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    Ashley Borofsky, being duly sworn, deposes and says that
she is a Postal Inspector with the United States Postal
Inspection Service ("USPIS"), and charges as follows:

<u>COUNT ONE</u>
(Mail Fraud)

    1.   From at least in or about July 2011, up to and
including the present, in the Southern District of New York and
elsewhere, VITALY BORKER, the defendant, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, for the purpose of executing such scheme and artifice
and attempting so to do, did place in a post office and
authorized depository for mail matter, matters and things to be
sent and delivered by the Postal Service, and did deposit and
cause to be deposited matters and things to be sent and
delivered by private and commercial interstate carriers, and did
take and receive therefrom, such matters and things, and did
cause to be delivered by mail and such carriers, according to
the directions thereon, and at the places at which they were
directed to be delivered by the person to whom they were
addressed, such matters and things, to wit, BORKER defrauded

customers of his retail eyewear website, "OpticsFast.com," by, among other things, misrepresenting the authenticity and condition of merchandise he sold and mailed to such customers.

(Title 18, United States Code, Sections 1341 and 2.)

COUNT TWO
(Wire Fraud)

2.   From at least in or about July 2011, up to and including the present, in the Southern District of New York and elsewhere, VITALY BORKER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, in electronic and telephonic communications, BORKER engaged in a scheme to defraud customers of his retail eyewear website, "OpticsFast.com," by misrepresenting the authenticity and condition of merchandise he offered for sale and sold to customers.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3.   I am a Postal Inspector with the USPIS. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents and my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all the facts that I have learned during the course of the investigation.  Where the contents of conversations of others are reported herein, they are reported in substance and in part.

OVERVIEW

4.   On or about December 16, 2010, VITALY BORKER, the defendant, was charged with mail and wire fraud, cyberstalking,

2

USAO_0000388

and making threatening communications in connection with his operation of an online eyewear business, DecorMyEyes.com. *See infra* ¶ 11. BORKER pled guilty to those crimes on or about May 12, 2011. Shortly after pleading guilty, and since at least July 2011, BORKER has been the owner and operator of another online retailer of purported new designer eyewear, known as OpticsFast.com.  But the eyewear sold to customers through OpticsFast.com has, instead, often been defective, damaged, used, or counterfeit. On many occasions, BORKER has also refused to refund customers' purchases, charged unauthorized restocking fees, or never sent eyewear for which customers had been charged. When those customers tried to return merchandise, BORKER subjected them to a campaign of abusive emails and text messages, often using aliases.  As described below, OpticsFast.com has repeatedly defrauded its customers, *see infra* ¶¶ 5-9, and it is owned and operated by BORKER, *see infra* ¶¶ 10-14.

### OPTICSFAST.COM DEFRAUDS CUSTOMERS

5.    Based on my participation in this investigation, I am aware that "OpticsFast.com" is the website of an online retailer of purported luxury eyewear ("OpticsFast"), based in Brooklyn, New York. Based on my review of OpticsFast.com, I am aware that as of April 21, 2017, the website advertises OpticsFast as "the planet's biggest online website for designer discount sunglasses and eyeglasses." The website includes claims that "[a]ll items are brand new and 100% authentic," and "[a]ll merchandise comes with the designer eyewear case, authenticity card and dust cloth where appropriate." The website also markets prescription and eyewear repair services, including offers to fit eyeglasses with custom prescriptions.  OpticsFast.com indicates that the business will provide a "free pre-paid shipping label" to customers using the website's repair or prescription services.

6.    Similar representations are made to prospective and realized customers of OpticsFast through email communications from the email address sales@opticsfast.com (the "OpticsFast Email Account"). Based on my review of dozens of email communications sent from the OpticsFast Email Account, I have learned that the user(s) of the OpticsFast Email Account tells OpticsFast customers that eyeglasses sold by OpticsFast are "designer brands," and that the company offers a "Free Pre-Paid shipping label" for eyeglasses sent to the company for repair.

7.    Based on my review of customer complaints registered with the United States Postal Service, the Federal Trade

USAO_0000389

Commission, and the Better Business Bureau of New York, and my conversations with a USPIS Postal Inspector who has spoken to customers of OpticsFast ("Postal Inspector-1"), I have learned that the foregoing representations made about OpticsFast, *see supra* ¶¶ 5-6, are false, in that, among other things, the eyewear that customers purchased from OpticsFast was often defective, damaged, used, counterfeit, and did not come with any "certificate of authenticity." Specifically, from my review of customer complaints, of which there are at least five hundred, and interviews by Postal Inspector-1 with some of these complainants, I have learned, among other things, the following:

    a. Many customers that have purchased eyewear from OpticsFast—eyewear advertised on OpticsFast.com as "brand new" and "100% authentic"—instead received damaged and/or counterfeit items. Multiple customers, including customers located in Manhattan, New York, reported ordering name-brand eyeglasses or sunglasses, paying a premium because of the brand, and then receiving inexpensive knockoff glasses. I know from speaking with another USPIS Postal Inspector that other customers have stated that they received poorly-made, dirty, and/or damaged glasses from OpticsFast.

    b. For instance, I have spoken to Postal Inspector-1 who interviewed an individual living in California ("Victim-1"), who, in or about January 2017, purchased from OpticsFast what was advertised on OpticsFast.com as a hard-to-find pair of Ray-Ban glasses with prescription lens. When Victim-1 received damaged knockoff Ray-Ban glasses of a different model, with the wrong prescription, she complained to OpticsFast and asked for a refund. The company refused, and she wrote a negative review online of OpticsFast. She then began receiving approximately 35 telephone calls per day and a torrent of emails from the OpticsFast Email Account, including emails calling Victim-1 a "stupid stupid lady" and a "total degenerate." After Victim-1 convinced her bank to freeze her payment to OpticsFast, she received an email from the OpticsFast Email Account, signed by "Becky S.," which stated, "[it] could have been done another way but you choose this route… Now sit in what you made." Victim-1 also received a telephone call from a man who identified himself as a police officer and told Victim-1 that a "civil harassment suit" had been filed against her by OpticsFast.

    c. I have spoken to Postal Inspector-1 who interviewed an individual living in Texas ("Victim-2"), who ordered Carvell eyeglasses from OpticsFast in or about January 2017. Victim-2 did not receive anything from OpticsFast for over three weeks and was put on hold when she called the

USAO_0000390

company, so she wrote an email to inquire about her order and complain about the delay.  Victim-2 received a response from the OpticsFast Email Account, signed by "Becky S.," which stated, "you will be put on hold when we are busy.  That is for shits sure."  When Victim-2 tried calling the company, a purported OpticsFast employee yelled at her and said, in sum and substance, that OpticsFast would subpoena and sue her.

       d.    Based on conversations with other OpticsFast customers who have spoken to the USPIS, and my review of customer complaints filed with the Better Business Bureau or posted to the Internet, I have learned that when OpticsFast customers have attempted to return purchased items for being counterfeit, damaged, or not as advertised, OpticsFast has refused to issue refunds, or has only issued partial refunds. Additionally, OpticsFast has charged customers a "restocking fee" of $40 or of twenty percent of the original purchase price, and shipping charges on many of these returned orders.

       8.    I have also reviewed customer complaints relating to OpticsFast's purported eyewear repair services.  Based on my review of complaints from customers living in Manhattan, New York, and elsewhere, and my conversations with Postal Inspector-1 who spoke with OpticsFast customers, I have learned that OpticsFast has returned eyewear sent in for repair, often after weeks of delays, unfixed or further damaged.  In some cases, OpticsFast has sent customers eyeglasses different from those that the customers sent in, or it has refused to return customers' eyeglasses. Among other things, I have learned the following:

       a.    I have reviewed a complaint submitted by an individual living in Georgia ("Victim-3"), who, in or about September 2016, sent a pair of sunglasses to OpticsFast to be repaired.  When the sunglasses were returned to Victim-3 by OpticsFast, they were a different, inexpensive pair of sunglasses.  When Victim-3 complained to OpticsFast.com, she received an email from the OpticsFast Email Account, signed by "Becky S.," which stated "shit happens" and "maybe it just wasn't meant to be."

       b.    I have spoken to Postal Inspector-1 who interviewed an individual living in New York, New York ("Victim-4"), who, in or about November 2016, sent her eyeglasses to OpticsFast to have the bridge repaired.  OpticsFast emailed Victim-4 that the repair would take approximately ten days and charged Victim-4's credit card for the repair.  After six weeks of waiting, Victim-4 contacted OpticsFast about her eyeglasses.

5

The company claimed it had returned the eyeglasses, but when Victim-4 ultimately received them, they were a different pair of eyeglasses that had been shipped from China.

     c.   I have spoken to Postal Inspector-1 who interviewed an individual in New Jersey ("Victim-5"), who, in or about February 2017, sent his sunglasses to OpticsFast to have the lenses replaced.  OpticsFast returned the sunglasses to Victim-5 with a note that said the company could not fix the sunglasses.  Victim-5 emailed OpticsFast for a refund, and OpticsFast responded that returning the sunglasses was a mistake, and that Victim-5 should send them back.  Victim-5 told OpticsFast that he was going to dispute the charge with his credit card, and received a response from the OpticsFast Email Account, signed by "Becky S.," which stated, "I am very not worried.  I have been doing this for a decade.  I will teach you a thing or 2 indeed."  Victim-5 also spoke to a male individual who claimed to be the owner of OpticsFast, and he stated, "I've been doing this a long time – over 10 years – and I promise you won't get your money back."

     9.   I have also reviewed complaints by prospective customers of OpticsFast who were sent purportedly "free" United States Postal Service shipping labels by OpticsFast. Based on my review of customer complaints, and my conversations with law enforcement agents who have spoken to individuals who received these shipping labels from OpticsFast, I have learned that after prospective customers have filled out a form on OpticsFast.com to get a quote for eyewear, replacement lenses, or repairs, OpticsFast has sent a shipping label instead of a quote.  These prospective customers did not request the shipping label and did not use it.  Nonetheless, OpticsFast began contacting them through emails and by text message, requesting that they pay approximately $6 for the shipping label.  When prospective customers have refused, OpticsFast has retaliated with harassment and threats of referring the matter to a debt collector, as follows:

     a.   I have spoken to Postal Inspector-1 who interviewed an individual in New Mexico ("Victim-6"), who visited OpticsFast.com in or about February 2017 and requested a quote for a lens repairs.  Victim-6 then received a mailing label from the OpticsFast Email Account.  Victim-6 subsequently saw poor reviews on the Internet for OpticsFast, decided not to send his lenses to the company, and never used the label. OpticsFast then began harassing Victim-6 to pay the cost of the shipping label.  Victim-6 started receiving hundreds of emails per day from the OpticsFast Email Account and, after Victim-6

USAO_0000392

blocked the email address, he continued to receive emails from other accounts on behalf of OpticsFast.  Victim-6 also received approximately 70 text messages per day from approximately 70 different numbers (all about OpticsFast), and he had to change his phone number to avoid being contacted.  One email sent from the OpticsFast Email Account, signed by "Becky S.," threatened, "Very soon we are going to send this to collections.  Be happy for now its just an email."

     b.    I have also reviewed a complaint filed by an individual in California ("Victim-7"), who contacted OpticsFast in or about 2016 about whether OpticsFast would honor a warranty on glasses that OpticsFast attempted to repair previously. Victim-7 did not receive a response, but did receive an email from the OpticsFast Email Account with an attached shipping label.  Victim-7 responded that she did not intend to send her glasses back to OpticsFast.  Victim-7 spoke on the telephone to a woman at OpticsFast who refused to give her name, and she told Victim-7, "We're taking you to collections!"

     c.    I have spoken to a USPIS Postal Inspector who interviewed an individual in California ("Victim-8"), who contacted OpticsFast in or about October 2016 to learn whether OpticsFast could fix his sunglasses.  Victim-8 clicked on a link on OpticsFast.com, which resulted in a shipping label being mailed to Victim-8.  Victim-8, however, never used the shipping label or any service from OpticsFast.  When Victim-8 refused to pay the cost of the shipping label that he did not use, OpticsFast began sending Victim-8 a text message every morning at 6 a.m. to demand payment.  The OpticsFast Email Account also sent Victim-8 hundreds of emails, including approximately 456 emails on a single day, hundreds of which had the subject line "I WIN!!!"

### VITALY BORKER OWNS AND OPERATES OPTICSFAST

    10.    As detailed below, VITALY BORKER, the defendant, owns and operates OpticsFast.  *See infra* ¶¶ 11-14. Although BORKER has employees who answer telephones and respond to emails, BORKER directs the operations of OpticsFast and deals directly with customers using the alias "Becky S."  *See supra* ¶¶ 7(b)-(c), 8(a)-(c); *infra* ¶¶ 13(c)-(f). While BORKER attempts to obscure his identity publicly, he has admitted his role in OpticsFast.com to his friends and work associates. *Id.*

    11.    Based on my participation in this investigation, my conversations with other law enforcement agents, and my review

USAO_0000393

of court records, I have learned that from in or about January 2007 to in or about December 2010, VITALY BORKER, the defendant, operated DecorMyEyes.com, an online retailer of purported luxury eyewear, based in Brooklyn, New York. Throughout the time DecorMyEyes.com was active, customers complained that the website sold counterfeit and defective eyewear, and when they complained, BORKER responded, often using aliases, with harassing and threatening emails. BORKER was indicted by a federal grand jury sitting in this District on or about December 16, 2010, charging him with, among other things, mail and wire fraud. He pled guilty on or about May 12, 2011, and was sentenced on or about September 6, 2012, principally to a term of four years' imprisonment to be followed by three years' supervised release. BORKER was released from prison in or about 2015.

12.   Based on my review of records provided by an email and website hosting company, I have learned that since August 2006, BORKER has leased, and continues to lease, computer servers under the company name DecorMyEyes.com.  The website OpticsFast.com and the emails sent to and received by the email domain @opticsfast.com are stored on the servers leased by DecorMyEyes.com.

13.  VITALY BORKER's operation of OpticsFast is also evident from his postings and conversations with others on Facebook. Specifically, based on my review of records provided by Facebook pursuant to a court-authorized search warrant, I have learned, among other things, the following:

a.   VITALY BORKER, the defendant, uses a Facebook account "vitaly.borker" with the public name "Vito Borker." Among other things, the profile photograph on this account resembles pictures of BORKER in law enforcement databases, and the biographical information available for the account states that the user lives in Brooklyn, New York, and is from Ukraine, which I know to be true of BORKER.

b.   The banner photograph on the homepage of BORKER's Facebook, which was posted on or about June 12, 2015, is a photograph of a pile of hundreds of sunglass cases. Based on my training and experiences, many of these cases appear to be for designer eyewear, including for eyewear designed by Chanel and Dolce & Gabbana.

c.   On or about May 5, 2015, a friend of BORKER on Facebook (the "Facebook Friend") sent a message to BORKER asking, "So what's the plan, building the website back up?"

USAO_0000394

BORKER responded in pertinent part, "I have a mess on my hands."
The Facebook Friend asked BORKER if he "still ha[s] any of the
girls working?" BORKER responded, "Nobody at this moment. I cut
everyone off. No money leaves this company until I bring it back
up." The Facebook Friend then asked, "What's the website again?"
and BORKER responded, "www.opticsfast.com."

       d.   Beginning on or about February 2, 2016, BORKER
communicated through Facebook messenger with a website
programmer who appears to be based in Pakistan (the
"Programmer") about making changes to OpticsFast.com. BORKER
wrote to the Programmer that he "built" OpticsFast.com, that
"this is my website, I designed it I did it all," and that
"opticsfast.com is MY baby.. its my site its what I been working
on for years." BORKER gave the Programmer instructions on edits
to make to OpticsFast.com and told the Programmer to email him
at the OpticsFast Email Account.

       e.   On or about February 8, 2016, BORKER posted a
photo collage, pictured below, of several photographs of himself
lying in what appears to be hundreds of sunglasses. With the
photograph, BORKER wrote in pertinent part, "I am looking for a
responsible fast paced person who can assist me at my Brighton
Beach office doing various projects for my eye wear e-Commerce
business. . . . Project one will be to help me sort this mess
and help me list the glasses on websites."



USAO_0000395

f.   On or about June 2, 2016, BORKER contacted an individual who had previously worked for BORKER when BORKER operated DecorMyEyes.com ("Former Employee-1").[1] BORKER asked Former Employee-1, in sum and substance, if she would start working for BORKER again. BORKER stated, "I need everything, you know how it is . . .it will end up being back to same as it was." Former Employee-1 eventually agreed to work for BORKER again.  BORKER provided Former Employee-1 a login for his website.  When the login for Former Employee-1 did not work, BORKER provided his own login identification, which was "becky."

g.   On or about August 9, 2016, an individual who worked for DecorMyEyes.com ("Former Employee-2") contacted BORKER. Former Employee-2 told BORKER that he had previously worked for DecorMyEyes.com and asked BORKER, in sum and substance, whether he was still in the eyeglasses business and whether he needed any assistance. BORKER responded, "Becky on opticsfast that is me :-)."

14.   Based on my review of bank records, I have learned that VITALY BORKER, the defendant, maintains a bank account in the name of Emalish Corporation and that he is the sole signatory on the account. Based on my review of records from the Emalish Corporation account, I have learned that BORKER typically receives over one hundred electronic payments per month from "Optics Fast Inc." that range from approximately $80 to $300. Based on my training, experience, and participation in this investigation, it appears that these are payments by OpticsFast.com customers for eyeglasses.

---

[1] Specifically, based on my review of notes taken by a USPIS Postal Inspector during an interview with Former Employee-1 on or about April 13, 2011, I have learned that Former Employee-1 was employed by BORKER to work for DecorMyEyes.com.

10

USAO_0000396

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of VITALY BORKER, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

Ashley Borofsky
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
19th day of May, 2017

HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11

USAO_0000397

**21 MAG 6772**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of a Warrant for All
Content and Other Information
Associated with the Google Voice Call
Number 718-635-3888 and Various
Email Accounts maintained at
Premises Controlled by Google LLC,
USAO Reference No. 2021R00452

---

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:     Google LLC ("Provider")

U.S. Attorney's Office for the Southern District of New York ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Postal Inspector Shabeka C. Bent of the United States

Postal Inspection Service, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, **t**he Court hereby finds there is probable cause to believe the Google Voice

call number 718-635-3888 and email accounts emalishcorp@gmail.com,

eyeweardepotinc@gmail.com, and vitoborker@gmail.com maintained at premises controlled by

Google LLC, contains evidence, fruits, and instrumentalities of crime, all as specified in

Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative

Agency, within 30 days of the date of service of this Warrant and Order, the records specified in

Section II of Attachment A hereto, for subsequent review by law enforcement personnel as

authorized in Section III of Attachment A. The Government is required to serve a copy of this

Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order

may be served via electronic transmission or any other means through which the Provider is

capable of accepting service.

19

12.06.2018

USAO_0000398

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence, and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

July 7, 2021
_____
Date Issued

11:04 a.m.
_____
Time Issued

_____
JAMES L. COTT
United States Magistrate Judge

20

12.06.2018

**Attachment A**

**I. Subject Accounts and Execution of Warrant**

  This warrant is directed to Google LLC (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the Google Voice call number 718-635-3888 and email accounts emalishcorp@gmail.com, eyeweardepotinc@gmail.com, and vitoborker@gmail.com (the "Subject Accounts").

  A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

  To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts:

  a. *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email) limited to items sent, received, or created between July 15, 2020 and the date of this Warrant and Order, inclusive;

  b. *Google Voice Data.* All Google Voice data, including the contents of any communications, whether voice, text, SMS, or other form, associated with the Subject Account.

USAO_0000400

c.   *Address book information.* All address book, contact list, or similar information associated with the Subject Accounts.

d.   *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

e.   *Transactional records.* All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

f.   *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

g.   *User device identifying information.* All records uniquely identifying the devices employed by any user(s) of the Subject Accounts to access the Subject Accounts, such as IMEI numbers or MAC addresses.

h.   *Google Calendar Data.* All Google Calendar data, including the contents of any calendar entries or agendas and invitees thereto.

i.   *Google Drive Data.* Any Google Drive files created, edited or stored by the Subject Account and data associated with the creation and editing of such files.

j.   *Google Hangouts Data.* All Google Hangouts data, including the contents of any communications, whether voice, text, Short Message Services ("SMS") messages, video or other form, associated with the Subject Account.

k.   *Google Maps Data.* All mapping, locational data, and Google Maps search queries associated with the Subject Account.

12.06.2018

USAO_0000401

l.  *Google Payments Data*. All Google Payments data, including any debit cards, bank accounts, or credits cards associated with the Subject Account, as well as any records pertaining to financial transactions associated with the Subject Account.

m. *Web and Search History*. All Google Chrome browsing history and search queries associated with the Subject Account.

n.  *Cookies.* All data related to Google's use and interpretation of cookies associated with the Subject Account.

o.  *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III.Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 2261A (cyberstalking), and 18 U.S.C. § 3583 (violation of supervised release) (the "Subject Offenses"), including the following:

- evidence that the Subject Accounts are operated by Vitaly Borker and used in connection with e-commerce relating to the selling and repairing of eyewear and other services related thereto;

- evidence of the procurement and/or sale of counterfeit eyewear and of BORKER or any co-conspirator's knowledge that such eyewear was counterfeit;

3

12.06.2018

- evidence of fraudulent quotations for eyeglass repair or false claims for shipping reimbursement;

- evidence of threats or harassment of customers who failed to receive correct orders; failed to pay for purported shipping expenses; or publicly criticized eyeglassesdepot.com;

- evidence of motive relating to the Subject Offenses, including financial need or gain;

- geographic location of user, computer, or device (the content and header information can both indicate that the email was communicated through a particular physical location; metadata from photo attachments can reflect geographic location); and

- identities and locations of any co-conspirators.

4

12.06.2018

USAO_0000403