```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                        22 CR 273 (JSR)

 5   VITALY BORKER,

 6             Defendant.               Sentence
     ------------------------------x
 7
                                        New York, N.Y.
 8                                      April 28, 2023
                                        3:30 p.m.
 9

10   Before:

11
                     HON. JED S. RAKOFF,
12
                                        District Judge
13
                         APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  MATTHEW WEINBERG
          Assistant United States Attorney
17
     MAYER BROWN LLP
18        Attorneys for Defendant
     BY:  GLEN A. KOPP
19        ELENA SANTO
          JINYOUNG LEE
20
     Also Present:
21   Christopher O'Rourke, Postal Inspector

22

23

24

25
```

1              (Case called)

2              MR. WEINBERG:  Good afternoon, your Honor, Matthew

3    Weinberg appearing for the government.  With me at counsel

4    table is Postal Inspector Christopher O'Rourke.

5              THE COURT:  Good afternoon.

6              MR. KOPP:  Good afternoon, your Honor, Glenn Kopp,

7    along with Elena Santo and Jinyoung Lee of Mayer Brown on

8    behalf of Vitaly Borker.

9              THE COURT:  Good afternoon.

10             We are here for sentence.

11             The first thing the Court has to do is to calculate

12   the sentencing guidelines.  The probation office had a

13   presentence report.  It calculates the offense level at 16 and

14   the criminal history category as IV, roman numeral IV.

15             Any objection to that by the government?

16             MR. WEINBERG:  No, your Honor.

17             THE COURT:  Any objection by the defense?

18             MR. KOPP:  No, your Honor.

19             THE COURT:  The Court also agrees with that

20   calculation and will adopt it.

21             Then with respect to the presentence report as a

22   whole, the defendant had numerous objections, some of which

23   were adopted by the probation department, indeed some with the

24   government's consent, but others were not.

25             Are there any of those objections that defense counsel

1    is now pursuing?

2         MR. KOPP:  No, your Honor.

3         THE COURT:  Very good.  I will adopt the presentence

4    report.

5         Just for the record, I assume your client read and

6    discussed with you the presentence report, yes?

7         MR. KOPP:  That's correct, your Honor.

8         THE COURT:  Very good.

9         Now we turn to what is of primary interest, which is

10   where under Section 3553 the defendant should be sentenced.

11        Let me hear first from defense counsel, then from

12   government counsel, and then from the defendant, if he wishes

13   to be heard.

14        MR. KOPP:  Your Honor, if I may use the podium, if

15   that's OK.

16        Your Honor, I just want to note for the record that

17   Mr. Borker's mother is here today.  Unfortunately, his

18   girlfriend/fiancé was unable to make it because she is picking

19   up a kid from school or daycare, so she won't be able to make

20   it today, but we appreciate --

21        THE COURT:  I have their submissions, so that's very

22   helpful.

23        MR. KOPP:  Your Honor, I have never enjoyed jail

24   visits more than our team's visits to Vitaly at Westchester

25   jail.  Ever since we were assigned to Vitaly's case in October

1    of last year, he has greeted us with a

2    roll-up-the-sleeves-and-let's-get-to-work attitude.  He took

3    pride in his ability to be a partner in helping us get up to

4    speed with the case after having come in months in with a large

5    amount of catching up to do with the discovery.

6             Vitaly was our enthusiastic guide as we prepared for

7    trial.  And, impressively, he frequently expressed his

8    appreciation for how hard we, as a team, worked for him,

9    especially Jinyoung and Elena, two first-year associates,

10   working on their first criminal matter.  Vitaly has always

11   treated them with respect.

12            When he was getting ready to plead guilty, he met it

13   with a sense of relief and hope that it would get him one step

14   closer to putting his criminal past behind him and returning to

15   his two boys, his mom, and his girlfriend.

16            Since Vitaly had been moved to MDC about two weeks

17   ago, however, we have seen a darker version of Vitaly, one who

18   is more full of fear and dread.

19            Once we get into the work preparing for the

20   sentencing, however, the analytical and determined Vitaly comes

21   out, but he's not the same person.  As bad as jail was for him

22   in Westchester, his time at MDC Brooklyn is already taking a

23   toll.  There are stabbings and lockdowns.  He is being

24   dehumanized.

25            THE COURT:  The Court is aware of the very bad

1    conditions in the MDC.  I will take account of that.  But of

2    course he is going to be moved, once sentence is imposed, to a

3    federal prison where most of those conditions will be

4    ameliorated.

5         I am not quite sure whether this is of more than

6    modest relevance here.

7         MR. KOPP:  I understand, your Honor.

8         The point I'm trying to make here is, ultimately

9    Vitaly has been in for almost 15 months, a significant amount

10   of time, and I think the time at MDC for someone who is

11   involved in a nonviolent offense has extra weight.  I

12   understand that the federal prison's long-term facilities are

13   different, but we have noticed a change and it has only been a

14   few weeks, but it has been significant.

15        THE COURT:  I am glad you brought that to my attention

16   because I do wonder what the U.S. Attorney's Office has been

17   doing with respect to the conditions in the MDC.  In sentence

18   after sentence after sentence, I am told by highly responsible

19   defense counsel that the conditions in the MDC have greatly

20   deteriorated, that the problems that used to be in the public

21   eye associated with Rikers Island on the state level have now

22   too often been seen at the MDC.

23        While this is a matter usually raised with the Court

24   legitimately for saying the sentence should be reduced from

25   what it otherwise would be because, in effect, it's a further

1   hardship that's being imposed, and I'm not unsympathetic to

2   that, I'm beginning to wonder whether the U.S. Attorney's

3   Office has really focused on its responsibilities.

4        The Bureau of Prisons, unfortunately, has a history of

5   saying everything is all right when it's often not all right.

6   I don't mean to minimize the very great difficulties that the

7   Bureau of Prisons has, but the point is is that the MDC has

8   become something of an outlier.

9        Independent of the sentence, I am going to ask the

10  Assistant U.S. Attorney to consult with the U.S. Attorney and

11  the chief of the criminal division and provide me, no later

12  than two weeks from today, with a letter which can be *ex parte*,

13  if necessary, and can be under seal, if necessary, but are not

14  compelled to be either, indicating whether in fact they agree

15  that the MDC is experiencing unusually severe problems over the

16  last couple of years, whether and what steps are being taken

17  beyond platitudes to rectify those problems.

18        Having said all that, I think it is in this case small

19  potatoes because, first, he has only been in the MDC a few

20  weeks.  Many of the people I've had to sentence in recent

21  months have been there for many weeks, if not months.

22        Secondly, and more importantly, I think the primary

23  issues in this sentencing are, first, that Mr. Borker seems

24  incapable of learning his lesson, that he just continues to

25  engage in fraud.  It's not my philosophy, although it's

1   permitted by section 3553, to impose an additional amount of

2   time beyond what I would otherwise impose simply to in

3   incapacitate the defendant for what seemed likely to be his

4   future crimes.  I won't do that here, and I have never done

5   that, even though the statute permits it.  But I must say, it's

6   hard for me to feel one ounce of sympathy for a defendant who,

7   despite meaningful punishments in the past, just keeps doing it

8   again and again and again.

9          The other issue that looms large in the Court's mind

10  is the extent to which he harassed those who complained.  I

11  want to hear a little bit more about that.  I've received some

12  letters bearing on that.

13         Let's start with the first issue.  How can I give this

14  guy anything less than three or four years when he hasn't

15  learned his lesson?

16         MR. KOPP:  That's exactly an incredibly fair question,

17  your Honor, and one we want to take on head on.

18         We think that the Vitaly that stands before you today

19  is a different man, and not just because of the last 15 months,

20  that there is a progressively -- it is hard to say.  It's still

21  fraud.  It's still crimes that he committed again in 2020.  But

22  the nature and circumstances of those crimes have changed.  The

23  desperation which he faced when he got out of prison in 2020 is

24  different than what he faced when he was committing crimes in

25  2010 and '11.

1           When he left prison in November of 2020, he had a

2   family to support, a child he had never met before, was born

3   right before he had gone in.  He had a mother who was aging and

4   in worse condition than when he had gone in the first times.

5   And he had understandable conditions that limited his ability

6   to work in a field that he had gotten used to and that he

7   absolutely, 100 percent, should not have touched with a

8   ten-foot pole.  He should have stayed away.  It opened up the

9   worst demons in him, and he went back to doing what he had done

10  before.

11          But the crimes that he had committed earlier, your

12  Honor, and I think this is significant -- and his punishments

13  were driven by worse things than selling used glasses.  They

14  were driven the first time by the threats.  Not just bad

15  salesmanship; awful threats.  The second time it was by a

16  threat to the sister of a codefendant here.  That's not the

17  crime he committed.  There are instances in which he used

18  inappropriate tactics in terms of dealing with customers.  But,

19  your Honor, that is a small number of the overall number of

20  customers that came to that website and bought glasses.

21          THE COURT:  That's a fair point, but let me ask you

22  about -- this is also a question I want to hear from the

23  government on.  There was one case, this goes back to his prior

24  convictions, at least one case where he told the victim he knew

25  where she lived and would commit sexual violence on her.  There

1    were others that he threatened with physical violence.  But I

2    am not clear whether that was true with respect to any of the

3    victims of this case, of the crime that I have to sentence him

4    on.  To the extent that occurred in the past, that was taken

5    into account in the sentences that were imposed in the past,

6    which were often substantial sentences.  I certainly do not

7    propose to sentence him again for that past -- those threats.

8    But were there any such threats in this case?

9            MR. KOPP:  Not that I'm aware of, your Honor, no.

10           THE COURT:  I want to confirm that with the government

11   in a minute, but I think that is a mitigating factor.

12           MR. KOPP:  Thank you, your Honor.

13           I do think that the Vitaly of today is a different

14   person.  He has learned -- he didn't learn enough from the

15   previous mistakes, and there is no dispute that he needs to be

16   punished, and he has been punished significantly already, we

17   would suggest.

18           Again, the change to MDC was only recent.  This is

19   something that we only would have said because of what happened

20   over the last couple of days.  But we still think that the 14

21   months he spent in Westchester is significant.

22           This crime, your Honor, was not about greed.

23   Mr. Borker didn't pocket or profit every dollar that came into

24   the company.  He didn't lead a lavish lifestyle.  He had to

25   support his family, his girlfriend, and soon-to-be fiancé.  Has

1    no family in the United States.  She is a widower.

2         You saw some of the things she said about the changes

3    in her life and the hope that he gave her when they got

4    together.  So he had a family to support in a way that he

5    didn't have those responsibilities in the same way before, and

6    he understands that the risks that he took, the mistake he made

7    impact the victims.  They impact his mother, his girlfriend,

8    and his two children in ways that he is profoundly impacted by.

9    The letters that you have seen from his family really

10   demonstrate that, and it's not just us saying that, your Honor.

11        When he was in Westchester, one of the nice things

12   about it, it was the ease at which he could communicate with

13   the rest of the world.  He spoke to his mother five times a

14   day.  She is 85.  She suffers from numerous ailments.  In fact,

15   Vitaly was sort of an early adopter to working from home

16   because he could be home to drive her to appointments.  And it

17   is ironic that the thing that he did to try to be home for his

18   mother led him to make the mistakes that have put him here

19   today.

20        Going back to when he left the halfway house in

21   November of 2020, even his mother noticed that despite not

22   knowing the deceit he was involved in, nonetheless, she noticed

23   a different person.  When he spoke to customers, he didn't

24   raise his voice.  He treated them all respectfully.  And there

25   are times when did he not in his email exchanges, but not to

1  the level that he did before.  So lessons have been learned,

2  just not enough.

3         Your Honor, you saw in the letter from Vitaly's

4  14-year-old son, Ryan, who described a doting father who is 100

5  percent committed to finding ways to be present in his son's

6  life despite the obstacles.  Vitaly got involved in managing

7  rental apartments in New Jersey to make money by Airbnb in an

8  effort to be closer to Ryan, because Vitaly's exwife had moved

9  them to New Jersey.  Vitaly used that time with Ryan to teach

10 him practical things, like how to fix can things around the

11 house when he cleaned the apartments.

12        Vitaly's absence has and will impact Ryan severely,

13 and that's something that he has to live with.

14        Again, you saw what Vitaly's fiancé, Marina, has

15 written about the impact that he has had on her life.  And she

16 will be raising and has been raising their five-year-old by

17 himself, without a family, and until Vitaly comes home that

18 will be a struggle.

19        The other ways, your Honor, why we think this is a

20 different man who sits before you is some of the things you saw

21 from his friends who wrote in support.  I think it's Exhibit 12

22 to our letters from Russell Levy.  He writes about Vitaly

23 having taken steps to improve himself, to better himself over

24 the years, seeking therapy and counseling, and we don't talk a

25 lot, and our letter mentions some of the struggles he has had

1    with mental illness.  That is not an excuse for his conduct.

2    It is just a fact of his life, and he has taken steps,

3    including --

4            THE COURT:  No.  I think it's a mitigating factor.  I

5    found that quite interesting, and I appreciate all the

6    psychiatric information that was provided by both sides.

7            MR. KOPP:  Your Honor, one other thing we wanted to

8    talk about in terms of the sentence.  You mentioned why

9    shouldn't you sentence him to three or four years.  The other

10   thing we thought was interesting was the sentencing guidelines,

11   proposed amendment on criminal history.

12           THE COURT:  Here is the problem you have there.  As I

13   have stated on the record numerous times, I think the

14   guidelines as a whole are totally irrational.  I give them

15   almost no weight other than what I'm compelled to give them by

16   operation of law.  That's why I calculate those guidelines at

17   the start.

18           I don't want to waste everyone's time with describing

19   why I regard the guidelines as totally irrational, because it

20   would take me several hours.  But just in brief summary, the

21   guidelines, first, are based on the assumption that numbers can

22   be assigned to particular aspects of all the multiple factors

23   that any court has to consider in a sentence.

24           I have never actually seen the sentencing commission

25   justify in any principled way why it picks two points for this

1    or three points for that.  In my imagination, they just throw

2    it down the stairway and see which one lands on stairway 2,

3    stairway 3, or stairway 4.

4         Then we get to the fact that in white collar crimes

5    the guidelines place inordinate emphasis on the amount of loss.

6    In a typical white-collar case that is about 70 percent of the

7    calculation of the offense level.  The same problem exists in

8    drug cases where it's at amount of drugs that are distributed

9    that typically cause about 70 percent of the offense level

10   calculation.

11        It's not that those things are irrelevant, but why are

12   they given such heavy weight?  It is because they could be

13   counted, and this is an arithmetic system, so anything that can

14   be counted gets emphasized because all the rest is totally

15   subjective.

16        Then there is the sad history, which is not at

17   relevant here to this particular case of the racist history of

18   the guidelines, such as, for example, giving crack cocaine a

19   hundred-time multiple to powder cocaine, even though there is

20   no scientific basis for doing that.  Crack cocaine is simply

21   baked powder cocaine.

22        But because of the fear that it was associated with

23   violence, even though that happened to be a function of the

24   communities in which it was operating, as opposed to the drug

25   itself, they had this absurd and irrational calculation that

1    operated in a clearly discriminatory manner against persons

2    with color.

3          And when they changed it, the best they could get out

4    of Congress was 18 to 1.  Even though that is just as

5    irrational as the 100 to 1, it's just not as bad.

6    Irrationality seems to be the modus operandi to those who

7    address the guidelines.  Then there is, of course, the fact

8    that the sentencing commission itself has been under heavy

9    pressure from Congress and often directed by Congress to

10   evermore up the guidelines and make them evermore punitive.

11         Then there is the fact that from the very start, the

12   guidelines expressly said that things like family history would

13   be irrelevant because that was not, quote, truth in sentencing,

14   what baloney that is, as if the defendant is some person from

15   Mars who lands here and commits his or her crimes without the

16   long extensive history, psychological and familial, that every

17   defendant that I have seen carries as part of his baggage.

18         But I won't go on.  My point is, you don't need to

19   worry about the guidelines.

20         MR. KOPP:  Thank you, your Honor.  I think I'm

21   probably going to stop there, unless your Honor has questions.

22         THE COURT:  That's fine.  I'm anxious to hear from the

23   government.  We will come back to you and your client in a

24   minute.

25         Let me hear from the government.

 1              MR. WEINBERG:  Yes, your Honor.

 2              It's the government's view, just to respond to

 3    something defense counsel said, that the nature of this crime

 4    did not change in any significant way from the nature of the

 5    prior two crimes.

 6              With respect to the threats, because the Court has

 7    inquired about that, it is correct that the government did not

 8    identify any threats, significant threats of physical violence,

 9    sexual violence, anything rising to the level of a new crime.

10    Of course, he was charged with federal crimes arising out of

11    the threats in his first case.  He was not charged with that in

12    the second case.  The second case was just a fraud case.  This

13    case continues.  In that pattern it's a fraud case.

14              There certainly were customers, as the Court has

15    gotten a flavor of from the victim-impact statements and some

16    of the emails, who the government would say were harassed, not

17    rising to the level of a crime, but received more than just

18    poor customer service, but real harassment that they should not

19    have received.

20              But, fundamentally, the defendant was convicted twice

21    of operating fraudulent eyewear websites or fraud relating to

22    eyewear websites.

23              THE COURT:  In many ways, it seems to me, he made an

24    irrational choice.  He knew, from his prior experience, that if

25    he continued with this kind of fraud that he would go to prison

1    if caught.  He said, for whatever reason, I'll take the risk.

2    To put a slightly unfair slant on the point you just made, I'll

3    be a much sweeter fraudster this time around.  But he knew for

4    sure that the natural reaction of any judge to his reindulging

5    in the same fraudulent behavior was, OK, you cut a bargain.

6    The bargain was, there was X percent chance you will get

7    caught, but if you did get caught you knew you were going away.

8    I'm happy to abide by his bargain.

9         MR. WEINBERG:  Yes, your Honor.  In that regard, it's

10   worth noting, from the government's perspective, that the

11   defendant was transferred to the residential reentry center in

12   June 2020 and then fully released from custody in November of

13   2020.  But in June 2020, he was at what is commonly referred to

14   as a halfway house.  That's exactly when this website started

15   and the fraud kicked off.  So it really was kind of at the

16   first opportunity to engage in really, again, what the

17   government views as fundamentally the same conduct.

18        The government submitted as an exhibit --

19        THE COURT:  When you're good at something, you want to

20   pursue it.

21        MR. WEINBERG:  Fair enough, your Honor.

22        The website itself is nearly identical to the last

23   website.  And the website just makes a series of false

24   representations about what the business was offering.

25        Without getting into too much of the nitty gritty or

1    details about what happened to this customer or that customer,

2    fundamentally, the defendant had twice previously been

3    convicted of operating fraudulent websites, so he knew that

4    what he was putting on the websites would be considered fraud,

5    unless there was some significant change in what the website

6    was actually offering, and it's the government's contention

7    that there was not a significant change than what the website

8    was offering.  It was the same business, or materially the same

9    business, and the same website.

10          To the extent that there was any changed behavior this

11   time, whether it be on the harassment side or on the fraud

12   side, a point that the government is not necessarily conceding,

13   but to the extent there was any changed behavior, in the

14   government's view, that is easily outweighed and

15   counterbalanced by the fact that it was the third conviction,

16   that there had been two prior convictions.  I think it's

17   perhaps putting a different spin on what the Court said.  Even

18   if it's 80 percent as bad, which is the point that the

19   government is not conceding, even if it was 80 percent as bad,

20   it was the third time.

21          THE COURT:  Let me ask you a much more minor -- minor

22   is the wrong word, but not directly relevant to the sentencing

23   itself.  But assuming I impose the sentence beyond time served,

24   which is highly likely, is there any reason he can't be moved

25   back to Westchester until he is transferred to whatever prison

 1    he is going to?

 2            MR. WEINBERG:  The government certainly has no

 3    objection to that.  As the Court, I believe, is aware, we don't

 4    have any real control.

 5            THE COURT:  No.  But you can have some persuasive

 6    input.

 7            MR. WEINBERG:  Perhaps it might be more persuasive if

 8    I knew that the Court was interested in that outcome.

 9            THE COURT:  I'm happy to make that recommendation and

10    happy to have the U.S. Attorney's Office make its best efforts

11    to implement that recommendation.

12            MR. WEINBERG:  I'm very happy to do that, your Honor.

13            THE COURT:  Let me hear, finally, anything further the

14    defense counsel wanted to say, and then we will hear from the

15    defense, if he wished to be heard.

16            MR. KOPP:  Your Honor, just one thing.

17            I do this with some hesitation because I understand

18    this is not to belittle or limit what happened.

19            But just one piece of context is that the business

20    itself and the numbers we are talking about here and the

21    individual impact on people, again, it doesn't change the fact

22    that he made this decision and he knew that he had been --

23            THE COURT:  It was smaller in scope and impact than

24    many of the federal fraud cases that I have seen in the past,

25    and I think that's relevant.

1          MR. KOPP:  Thank you, your Honor.  That is right.

2          THE COURT:  Let me hear from the defendant.

3          THE DEFENDANT:  Your Honor.  I have written to the

4    Court a letter in preparation for sentencing which I hope

5    you've read.

6          THE COURT:  Yes.

7          THE DEFENDANT:  In addition, I just wanted to

8    highlight a few other points that I think are significant.

9          Your Honor, first and foremost, I accept full

10   responsibility for my conduct.  I absolutely dropped the ball

11   while I was doing work for Eyeglasses Depot.  I blame nobody

12   but myself.  This did not have to happen.  Besides the fact

13   that I should have never ever been involved in this business, I

14   should have been completely transparent regarding the origin

15   and the condition of the eyewear that I caused to be shipped to

16   these customers.

17         It was my plan that after being released from prison

18   in 2020, I would sell my interest in all of these websites and

19   be compensated on a monthly basis while the websites are being

20   operated by others, as they were while I was in prison for over

21   two years.  I wanted very much to have a secondary source of

22   income from the websites and do other things that were in

23   compliance with supervised release.

24         Unfortunately, being unable to find work during the

25   peak of the pandemic, when I was released, coupled with my

1    impulsivity, I simply found myself sucked back into a business

2    that I was prohibited from operating.

3         I justified my poor chooses to reenter the eyeglass

4    business on the fact that my financial obligations were

5    drowning me, and I was tired of taking advantage of my family,

6    who was supporting me financially.

7         I want your Honor to know that I did participate in

8    many other businesses, which, unfortunately, simply did not

9    financially pan out for me.  I developed a website for my

10   fiancé, who is now running her own business selling child bike

11   trailers, but that became a one-man operation.  I couldn't work

12   there and earn a profit.

13        I developed a software platform for another friend

14   that identified high leads for high-ranking food items on

15   Amazon, and he's sitting right behind me.  That is Mike.  That

16   investment ended up putting me in a loss.  I signed a

17   consignment deal to sell some of my eyewear stock on the

18   popular website the RealReal.  That worked out great, but I had

19   limited stock that was desirable.

20        I then subleased and furnished three apartments in New

21   Jersey for income on Airbnb with the help of my mother.  By the

22   time I started seeing a profit, I was arrested in this case and

23   I lost everything my mother invested, everything.

24        I made some sales in eyewear parts on eBay but the

25   profit was petty.  I really, really tried to do other things

1    and be able to support my financial obligations.

2            In hindsight, however, I should have tried harder to

3    distance myself from eyewear and find another career in a free

4    world with endless possibilities.

5            Most importantly, your Honor, I want you to know that

6    I was not motivated by greed.  I did not lead a lavish

7    lifestyle.  I earned less in all of my ventures combined than I

8    did working on Wall Street out of college 26 years ago.  I wore

9    the same clothing I purchased in 2010.  I drove the same

10   vehicle since 2015.  I was unable to make critical repairs to

11   my house that's dangerously falling apart.  When the probation

12   department came to my house, the entire balcony is falling

13   apart.

14           I spent virtually nothing on myself.  I spent nothing

15   on myself, nothing at all.  Every dollar I earned went towards

16   my children, everything.

17           On top of everything, I inherited a whole new set of

18   expenses, attributable to my exwife, who moved to New Jersey,

19   where I found myself driving multiple times a week to be with

20   my teenage son.  I acknowledge that I failed miserably in my

21   decision making.  I want to express how sorry I am to the

22   customers I deceived, my family and this Court.  I'll make sure

23   I have learned my lessons from my mistakes.  I will treat my

24   customers with the respect and honesty that they deserve.

25           My goal is to put this catastrophe behind me and start

1    a new chapter in my life.  I have developed two business ideas

2    that I will secure permission from probation before I put them

3    into action.

4           My first idea, I want to help my fiancé continue to

5    develop her stroller business.  She wants to grow her business

6    by working with manufacturers to get into big retail stores.  I

7    want to use my experience with the justice system, prison, over

8    the past 13 years to help others by acting as a consultant to

9    families that have a family member in prison.  I have firsthand

10   experience, unfortunately, to how committing crime and being

11   sentenced deeply affects a person's family members, friends and

12   community.  I want to help families through the prison process

13   and become a prison consultant.

14          Even after all the problems that I have caused

15   throughout the years, I still have many people who remain

16   committed, supportive, and believe in me, and I will not

17   disappoint them.  I will never do this again.  I will never be

18   involved in any of these kinds of businesses that would

19   jeopardize my liberty, my freedom.  I just want to be with my

20   family, and I want to start a new life.

21          This is over.  The glasses business is over.

22   Everything that I did, everything that I built, it's over.  I

23   will never touch it again.  I will never come near it again.

24   You will never see me in this courtroom again.  The intern will

25   never hear about me again.

 1              This is a huge mistake.  It didn't have to happen.  I

 2      should have drove a taxicab when I came home.  I should have

 3      done anything other than this, anything, anything.  I should

 4      have sold my house.  I should have defaulted on my mortgage.  I

 5      should have stayed home and not done anything.

 6              Thank you for listening to me, your Honor.

 7              THE COURT:  Thank you very much.

 8              There is one person in this courtroom to whom my heart

 9      goes out.  It is the defendant's mother because as the

10      defendant's own articulate statement demonstrates and as the

11      Court already recognized from the excellent submissions I have

12      received, this defendant is a highly intelligent person, a

13      person of great promise.

14              Yes, he has psychological difficulties, and that's

15      been a problem that he has had to deal with, but throughout he

16      has had the love and support of his mother, who now is herself

17      at an age where she is ever more in need of help from her son.

18      So in many ways she is a primary victim of the defendant's

19      misconduct.

20              As I say, my heart really goes out to her.

21              The factors bearing on sentence, and I have considered

22      all the factors under section 3553(a), largely point in favor

23      of a substantial sentence here.  But I think there are some

24      mitigating factors.

25              One, which I have just alluded to, is the need to be

1  of help to his mother and his fiancé and child.  Another is the

2  hope that this Court harbors that this, in many ways, gifted

3  human being can still turn his life around and still be a

4  productive and helpful citizen or person.  And I also think

5  it's not irrelevant that, in the broader scheme of things, the

6  immediate crime that I'm sentencing this defendant for was not

7  one of huge financial impact in the way that many federal fraud

8  cases are.

9         Having said all that, we come back, of course, in the

10  end to the fact, he did it again and again and again, and he

11  did it here while he was on supervised release in a halfway

12  house and at a time when he should have been most aware of the

13  need to play exactly by the rules, not even come close to a

14  violation.

15         Putting all that together, the sentence that I

16  normally would have imposed here would have been three years.

17  I am going to knock that down to two and a half years, partly

18  for the mitigating reasons I have just mentioned and partly

19  for -- I give some credit to the fact that being in the MDC,

20  even for a few weeks, is, one could well argue, cruel and

21  unusual punishment.

22         The sentence of the Court is that the defendant is

23  sentenced to 30 months in prison, to be followed by three years

24  of supervised release on terms I'll get to in a moment.  No

25  fine will be imposed because there will be a substantial

1    forfeiture in the sum of $145,671.58.

2            Is that the same amount for restitution?

3            MR. WEINBERG:  Not quite, your Honor.  The government

4    was hoping to address that.

5            With respect to restitution, the government and

6    defense counsel have been in touch trying to arrive at a

7    consent restitution order.  I think it's fair to say that we

8    are close, but we are not quite there yet.  If the Court would

9    just order that it will be issuing restitution, and the

10   government thinks that it will be promptly be able to --

11           THE COURT:  That is fine.  I think you have to do that

12   in, I can't remember if it's 30 days or 90 days.  Let's say 30

13   days and make sure we get it to me before then.

14           MR. WEINBERG:  Yes, your Honor.

15           THE COURT:  There is also, of course, a mandatory $100

16   special assessment that must be paid.

17           In terms of supervised release, I take supervised

18   release in this case with particular emphasis because I

19   guarantee you, Mr. Borker, that if you violate supervised

20   release in even the slightest respect, I am going to send you

21   back to prison because you just gave me a very eloquent

22   statement about how you are going to turn your life around.

23   You better mean it.

24           The terms of supervised release are:  First, the

25   mandatory conditions that the defendant not commit another

1    federal, state, or local crime, not possess a controlled

2    substance.  In that regard, within 15 days of his release from

3    imprisonment he needs to submit to one drug test to be followed

4    by two periodic drug tests thereafter, and he must cooperate in

5    the collection of DNA.  Once I receive the amount of

6    restitution, I will set a schedule for how much that is to be

7    paid.  It will be a percentage of his gross monthly income

8    beginning in the second month of supervised release.  But I

9    will need to know the amount before I set the percentage.

10            There will also be imposed the standard conditions 1

11    through 12.  They appear on the face of the judgment and will

12    be gone over with the defendant by the probation officer when

13    the defendant reports to begin his period of supervised

14    release, which he must do within 72 hours of his release from

15    prison.

16            Finally, there are the special conditions:  First,

17    that he will participate in outpatient drug and alcohol program

18    on the standard terms and conditions; second, he will

19    participate in an outpatient mental health treatment program on

20    the standard terms and conditions; third, that he cannot incur

21    new credit charges or open additional lines of credit without

22    the express prior approval of the probation officer unless he

23    is in compliance with the installment payment schedule that I

24    will impose once I hear from the parties on restitution;

25    fourth, that he must provide the probation officer with access

1    to any requested financial information; and, fifth, if the

2    probation office deems it necessary, he will permit the

3    probation office to install any application or software that

4    allows it to survey or monitor all activity on any computers,

5    automated services, or connective device that he will use

6    during the term of supervision.  I will spell that out in more

7    detail in my final judgment.

8            Lastly, the defendant will be supervised by the

9    district of his residence.

10           Before I advise the defendant of his right to appeal,

11   is there anything else that either party needs to raise with

12   the Court?

13           Anything from the government?

14           MR. WEINBERG:  Your Honor, other than just the

15   government moves to dismiss the open counts.

16           THE COURT:  Yes.  That motion is granted.

17           Anything from the defense?

18           MR. KOPP:  Your Honor, just to reiterate, if there is

19   any way he could get back to Westchester pending his

20   transfer --

21           THE COURT:  I strongly recommend that, and I'm asking

22   the U.S. Attorney, presumably jointly with defense counsel, to

23   make contact with the relevant people at the BOP and make sure

24   they know that's my recommendation, my strong recommendation.

25           MR. KOPP:  Thank you, your Honor.

1          Just, lastly, to ask, respectfully, if your Honor

2    could make sure that if in any way that he could be sentenced

3    to a facility with RDAP so that he continue to address his drug

4    and alcohol issues and substance-abuse issues.

5          THE COURT:  Yes.  I will recommend that.  I don't have

6    the power to order that.

7          MR. KOPP:  Understood.

8          THE COURT:  But I will recommend it.

9          MR. KOPP:  Thank you, your Honor.

10         I know Mr. Borker's preference is if there is any way

11   that there is availability either at Schuylkill or Danbury

12   facilities, those would be preferable --

13         THE COURT:  Again, I'm happy to recommend it.  There

14   was a time when those recommendations were followed

15   automatically.  But, unfortunately, with so-called mass

16   incarceration, there is less ability of the Bureau of Prisons

17   to necessarily follow those recommendations, but I'm happy to

18   recommend it.

19         MR. KOPP:  Thank you, your Honor.

20         THE COURT:  Mr. Borker, you have a right to appeal the

21   sentence.

22         Do you understand that?  You need to speak.

23         THE DEFENDANT:  Yes.

24         THE COURT:  If you can't afford counsel for the

25   appeal, the Court will provide one for you free of charge.

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Very good.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25